[No. 429.]

HENRY v. THE COLORADO LAND AND WATER CO.

1. PRACTICE—EVIDENCE.
A case must be reversed if evidence has been wrongfully admitted or if it has been wrongfully refused, unless it clearly appears that the testimony admitted could not have been prejudicial, or that which was rejected was of no importance to the party against whom the ruling was made.

2. EVIDENCE—NOTICE—RATIFICATION.
Where a president of a corporation makes a contract apparently within his authority, it is legitimate testimony to prove that he told the members of the directory what he had done, and that those directors when so informed approved of the act. If with this knowledge, no action was taken to interfere with the contract, and the parties proceeded to its execution and completed it, it brings the case within the range of the law of ratification.

3. INSTRUCTIONS.
An instruction which states to the jury that they may find any fact proven which they think rightfully and reasonably inferable from the evidence, is an inaccurate expression of the rule. The inference must of necessity flow from the fact and be a legitimate inference under the principles which govern the introduction of testimony. It is not every inference which the jury may think deducible from the facts which may be taken as the basis of their verdict.

*Error to the District Court of Arapahoe County.*

Messrs. FELKER & DAYTON, for plaintiff in error.

Messrs. PATTERSON, RICHARDSON & HAWKINS, for defendant in error.

BISSELL, J., delivered the opinion of the court.

Since this case was originally decided a petition for rehearing was granted and the case has been reargued and submitted to further examination. While we remain of our original opinion that there is error in the case, the court has reached a different conclusion with respect to the affirmative defense on which the court divided when the case was first decided. This compels us to formulate a new opinion and state our present conclusions. It would be manifestly impossible to write an opinion which would be satisfactory to counsel or to the profession and leave the first to stand since it would require very considerable comparison and analysis to contrast them and determine exactly what the court decides.

The action was brought on a contract to recover compensation for services alleged to have been rendered by O. H. Henry to The Colorado Land & Water Company in aiding the sale of tracts of land which that company bought from the state. Prior to 1890 the state was the owner of a large body of land in the county of Otero, and in 1889 the legislature passed an act providing generally for the sale and irrigation of state lands. T. C. Henry conceived the scheme of purchasing a large body of these lands in that county, constructing a ditch to irrigate them, and selling them as thus improved. On the 21, of January, 1890, he made an application to the state board of land commissioners to purchase the alternate half sections of this tract, and entered into a contract with the board binding the company to bid the minimum price which the board might fix, which was

placed at $2.50 per acre. By the terms of the offer a ditch was to be constructed and water furnished to the half sections whereof the state retained title. Under the arrangement the commissioners advertised the land for sale and the company bid off the subdivisions named in the complaint and on the 24, of October, 1890, the state issued to the company a certificate of purchase. It would appear from both the allegations and the proof that Henry did not have the capital requisite to commence and complete the ditch, but that his plan contemplated the sale of the lands and water rights and the use of the capital thus obtained to its construction which was indispensable to the success of the enterprise. Breaking in now on the general narration we refer to the complaint in order to make the cause of action apparent as it is stated, for this will tend to make the subsequent history a little more intelligible. After setting up the matters which have been suggested the plaintiff alleged generally that about the time the application was made, and in anticipation of the success of their efforts in this direction, the company employed the plaintiff as well as others to procure purchasers who should execute preliminary contracts binding them to buy. This was done to render it prospectively probable that the general scheme could be carried out and that a contract might be made for the construction of the ditch on the basis of the ultimate sale of the lands and water rights. All this was done before the lands had been offered for sale or the company had bid them in and prior to the actual statutory organization of the corporation. On the 8, of February, 1890, T. C. Henry sent the following letter :

" O. H. HENRY, ESQ.,

     " State Board of Land Commissioners, City.

     " *Dear Sir :* I hereby agree, for and in behalf of the Colorado Land and Water Company, to pay you commissions on the sales of land and water which you may make or cause to be made under the line of our canal within the territory em-

braced in the list of lands in Otero county, Colorado, which
are to be sold by the state on February 28th, as per applica-
tion for sale by the said company.

"The said commissions, which it is understood and agreed
shall be and not exceed the sum of $5,000, are to be paid in
cash when the certificates to said land shall be issued to said
canal company or its assigns; the intent being that you
shall be paid that amount in consideration of such sales as
you may effect and have effected of such lands, contingent
only upon said land and water company being successful
bidders and purchasers of said lands.

                                    "Respectfully,
                                             "T. C. HENRY."

This was signed by T. C. Henry though purporting to be
the contract of the corporation and it was alleged to have
been made on its behalf, and the proper allegations supported
by competent proof were inserted and offered to show Henry's
right to execute the contract for the corporation and a sub-
sequent ratification by the land company whereby it became
its contract. The plaintiff then alleged performance and the
procurement of purchasers whose contracts on the basis of
the original agreement as to commissions amounted to more
than enough to entitle the plaintiff to recover the sum speci-
fied in the letter of February 8. Payment of $1,000 was
made on the 7, of June, 1890. The balance was unpaid.
During the trial it appeared that the ditch was not completed
at the time agreed on and its construction was not finished
until long after the date specified in the offer to purchase
and possibly agreed on between the state and the company.
This is unimportant save as explanatory of the delays and
of some evidence given with regard to it. The ditch not
being finished and T. C. Henry failing to obtain the money
by the sale of lands and water rights, it was necessary that
the whole enterprise should be turned over to W. C. Brad-
bury, the contractor who was building the ditch, who was
elected president of the company, took possession of all of

its assets and was apparently the only person responsible for its claims because the general debts which the company owed were largely composed of the claim which he had for work done in the building of the canal. The plaintiff's claim was presented to him after he took possession and he declined to recognize it. In defending the case the company denied the employment of O. H. Henry, denied performance and as to the contract pleaded *non est factum*. By way of a further defense the company charged that at the time of the inception of the dealings between O. H. and T. C. Henry, O. H. Henry was the appraiser of the state lands under the state board of land commissioners, was in fact an officer of that board and in the employ of the state, charged with the duty of inspecting and of examining land which might be offered for sale, and that what was done between these two parties was in reality done for the purpose and to the end that O. H. Henry should aid and assist T. C. Henry and the company in making the contract with the land board and enable it to purchase the land at the minimum price and generally facilitate T. C. Henry's efforts in buying them. This need not be further stated because from what has been said it is evident it was the purpose of the plea to set up the invalidity of this contract because it was against public policy and under it the defendants might offer proof showing that the real consideration was the services which O. H. Henry was to render as an employé of the state land board and not as an individual. What has been said will render the controversy tolerably plain and there will be no other narration of facts except as they may appear in the discussion.

As we view it T. C. and O. H. Henry gave evidence concerning the persons whom the latter had interested in the property and who according to their testimony had become induced through his efforts to become purchasers. Whenever in the discussion we reach the domain of disputed matters we shall be exceedingly cautious that undue advantage may come to neither party on the subsequent trial by

reason of any expressions which might be taken as indicative of our views respecting the weight and character of the testimony. As the case now stands we shall assume that O. H. Henry interested a number of persons in the enterprise who ultimately bought land and water rights. The aggregate sum represented by these purchasers would make O. H. Henry's compensation larger than the sum named in the contract, if he was paid a percentage on these sales, according to the amount usually paid other persons who worked on commission. It was the testimony of both the Henrys that the original contract contemplated the payment of commissions at the usual rate, and that after these sales had been effected and the enterprise had become somewhat embarrassed financially they finally agreed that the amount to be paid should not exceed the sum of $5,000. We might legitimately suggest that there was no direct evidence in any wise tending to overcome the direct proof offered on this subject. When the two Henrys were put on the stand their original examination was of course confined to a statement of the circumstances which led to the making of the contract, proof of what was done under it and testimony to the point of performance. This proof of performance was of course essential to establish the consideration. When the examination in chief of each of these witnesses was concluded and the right to cross-examine arose, as might have been expected under the defense pleaded, counsel undertook by the cross-examination measurably to establish it. In one aspect of the case we do not question the right to pursue this course. Most of the argument by which the errors alleged are sought to be supported is based on the extent to which counsel was permitted to go in this direction. It is manifestly exceedingly difficult for the court to pick out and specify the occasions on which the true line of cross-examination was abandoned. We do not intend to reverse the case on this ground, nor are we prepared to state that what was done would be sufficient to entitle the plaintiff in error to overturn the judgment. In fact, we doubt it. These matters

are largely in the discretion of the trial court and these courts keeping the issues in mind generally restrain counsel and keep them within the proper limits. If it happens that these boundaries are overstepped it would seldom be true that because of it a case must be reversed. For this reason we do not feel called on to comment upon or discuss, except in two or three cases, these particular incidents notwithstanding they are made the subject of such elaborate argument. From what has been already recited the plaintiff was compelled to prove a consideration for his contract. To establish it he was bound to show that he procured purchasers who ultimately contracted with the company and bought the lands for which they had negotiated. In other words, he was bound to show that he had done everything that a broker must do to entitle him to his commissions. This gave the right to the cross-examiner to go into the subject of performance and generally to elicit anything which would tend in any wise to either cast discredit on the testimony which the witnesses gave or raise doubts respecting the true consideration of the agreement. For this reason we think it was entirely competent to examine T. C. Henry with reference to what he did when he turned the property over to his successor Bradbury, to examine him regarding the books and to ascertain what reasons if any there were for the omission to make an entry of this particular claim. The inquiries which were put to the witnesses respecting the debts of the company and the borrowing of money for the purpose of carrying on its transactions in no manner tended to discredit the evidence given in chief with respect to the contract or its consideration, nor do we see how in any wise it was proper on the cross-examination to pursue this subject which was in no manner involved by the examination in chief. The same might be said respecting the inquiry put to T. C. Henry whether or not he had procured transportation on the Atchison, Topeka & Sante Fé Railroad for O. H. Henry at the time he was attempting to find purchasers to buy the land and water rights. This matter like the former was in

no way involved, it did not refer to any matter which had been touched on in the examination in chief, nor did it in any wise tend to impeach the consideration and to us seems to transcend the limits of a proper cross-examination. The rule governing this matter is plain, will be entirely familiar to the judge who may preside at *nisi prius* and we think these simple suggestions are enough.

As we view it the court committed one grave error which compels the reversal of the case. This respects the striking out of a part of the testimony of Mr. Brockway who was called to testify on behalf of the plaintiff. The significance and importance of this testimony will be the more clearly seen when it is considered that the other parties who gave evidence in the case were the two parties between whom the contract was originally made and who were attempting to support it, both as respects its original integrity and as a contract of the land and water company and were therefore not indifferent nor without interest in the result. On the other hand, Brockway was at that time one of the directors of the water company, and likewise an attorney for Mr. T. C. Henry. So far as this transaction was concerned he was an indifferent and wholly disinterested witness. In the course of his evidence, he testified that he was one of the directors of the company, daily concerned in the transaction of its business and fully cognizant of the affairs of the company and of its growth and history. He likewise gave evidence to the point that most of the directors of the company had full knowledge of the existence of this contract, of what was being done under it, and were greatly pleased at Mr. O. H. Henry's successful efforts in that direction and approved of what Mr. T. C. Henry had done. After he had given this evidence in the direct examination, he was then re-examined and then recross-examined. In the course of the latter examination, he stated that whatever information he had respecting this matter he got from Mr. T. C. Henry or possibly also from his brother. Thereupon, a motion was made to strike out the testimony wherein he stated that he knew

O. H. Henry was employed to sell these lands because it appeared that he got his information largely, if not wholly, from Mr. T. C. Henry, who was then the president of the company. The portion of this testimony to be stricken out was not very clearly pointed out, but the motion was so broad that it must be taken to include nearly all of the evidence which Mr. Brockway gave on this subject. We regard this ruling as fatal to the judgment. It must be borne in mind that the only real defense which the company attempted to make out by the cross-examination of this witness, or by the witness which they produced, Mr. Bradbury, was based on the illegality of the consideration, and the theory that it was really entered into to procure O. H. Henry's aid in engineering the deal through the land board, rather than to compensate him for services. At first blush, it would not be evident that this testimony bore on that question, but mature reflection convinces us that the trouble lies deeper than the surface. To strike out what Brockway had given as his knowledge of the matter because it came from T. C. Henry might not perhaps be so harmful as to compel us to reverse the judgment, but in another view of it, it must be. When we remember that the point of attack was the consideration of the contract, and when we likewise remember that T. C. Henry was cross-examined hours on the reasons which he had for omitting to enter that contract on the books of the company and why there was no scrap of paper or entry among the company's records to show that the contract had been entered into and when he was examined at great length respecting his silence as to the unpaid portion of the consideration of the contract in the settlement with Bradbury and his counsel, the importance of this testimony is made evident. If the jury believed that this witness who was wholly disinterested and whose character and status were unquestioned told the truth respecting his information concerning the contract, and the time when it was a matter of discussion, and the source from which he got his information, it would probably have had great weight with them, to overcome the inferences

which were sought to be drawn from the omission to put the contract on the books or to state anything to Bradbury about it. Evidently about the time the contract was entered into it was a matter of general and frequent conference and communication between the president of the company who had executed it and the various members of the directory who were its governing body. It must have had some weight at least with the jury in the settlement of the inquiry, whether the contract was legitimate or illegitimate and in determining the importance which should be given to the failure to enter the contract on the books. The rule respecting the admission or rejection of testimony is exceedingly clear. A case must be reversed if testimony has been wrongfully admitted, or if it has been wrongfully refused, unless it clearly appears that the testimony admitted could not have been prejudicial, or that which was rejected was of no importance to the party against whom the ruling was made. As the Supreme Court of the United States has frequently put it, it must appear so clear as to be beyond doubt that the error did not and could not have prejudiced the parties' rights. *Deery v. Cray*, 5 Wall. 795; *Smiths v. Shoemaker*, 17 Wall. 630; *Gilmer v. Higley*, 110 U. S. 47; *Vicksburgh & Meridian Ry. v. O'Brien*, 119 U. S. 99; *Mexia v. Oliver*, 148 U. S. 664; *Boston & Albany Ry. Co. v. O'Reilly*, 158 U. S. 334.

It is impossible for us to concede that the striking out of this testimony may not have had great influence with the jury. There was an entire absence of an exact limitation on what was stricken out and both the motion and ruling were so broad and so general as to apparently eliminate from the consideration of the jury all of Brockway's testimony which covered his knowledge respecting O. H. Henry's employment to sell the land. This was the point of the controversy, the thing to be established, the basis of the plaintiff's case, and the object of attack. To strike out the testimony of a disinterested witness who was able to state fully his knowledge about it, and the knowledge of the other directors concerning it, and the source of his information, which turned

out to be T. C. Henry, excluded from the consideration of the jury matter which might have been the turning point of the case. We are not prepared to admit that T. C. Henry's declarations on this subject were not legitimate as original testimony. The testimony was certainly legitimate for the purpose of proving the knowledge of the directors, and therefore a ratification by the company. We cannot assent to the authorities which are cited by counsel in the petition for rehearing, that the knowledge brought home to the directors of the company is not legitimate for the purpose of establishing ratification, even though that knowledge be brought home to them individually and not while sitting as a board. There are many authorities to the effect that notice to individual directors is not enough. But this is neither notice nor information conveyed to an individual director, nor to the members of the directory by a stranger. It must be remembered that T. C. Henry was the president of the company. He was then engaged in the active management of all of the business affairs of the corporation, charged with the duty not only of conserving its interests but of advising the members of the directory of his acts, that he might have the benefit both of their advice and their approval. We think it quite within the range of legitimate testimony to prove that the president who did the act, and had apparent authority to do it, told the members of the directory what he had done, and that those directors when thus informed of it by the president approved of his acts. If, with this knowledge, no action whatever was taken to interfere with the contract, and the parties proceeded to its execution and completed it, it brings the case, as far as we are able to see, entirely within the range of the law of ratification. As we before intimated what T. C. Henry may have told the directors was not hearsay at all. It was exactly like the communication of an agent to his principal, or a principal to his agent, or a communication from one partner to another. They are declarations made by a party charged with certain duties, clothed with certain powers, and responsible to the governing body

of the corporation, to wit, the directors. Under such circumstances what the president said was entirely competent, it bore on a legal issue in the case, and it is not clear to us that its striking out was not prejudicial. The ruling of the court thereon is error, for which the cause must be reversed.

There is one other matter to which our attention must be directed before we dispose of the case. That portion of the original opinion, in which the present writer did not concur, which adjudged the testimony offered in support of the affirmative defense, to wit, the illegality of the consideration insufficient to support it or to warrant the submission of the matter to the jury still remains to be disposed of. It is a matter which must be very cautiously discussed. This is on the hypothesis that the reversal on the other grounds will still leave it for disposition on the new trial. We are not inclined to withdraw the consideration of that issue from the jury. We may very safely say the company offered little testimony to support it. In this respect the case rested much on the inferences which might be drawn from what was said by T. C. Henry and O. H. Henry in the course of their cross-examination. It is true Mr. Bradbury gave direct testimony respecting the statements of both of them on the subject of the real consideration but whether evidence of such declarations in the face of positive testimony to the contrary would be sufficient to justify a verdict we do not propose to decide nor in this opinion hold that the issue may not be again submitted.

We think the court erred in giving the ninth instruction because although it may contain the germ of a correct legal principle, yet, without some limitation and the expression of the true doctrine in such matters, this abstract statement must have been prejudicial to the plaintiff. When a court undertakes to say that in determining what facts are true, the jury may consider not only all the evidence and all the circumstances of the transaction under investigation, but may also find any fact proven which they may think rightfully and reasonably inferable from the evidence, it puts a

dangerous weapon in the jury's hands. There are some inferences which may be legitimately drawn, and there are some presumptions, both of law and of fact, of which courts and juries are bound to take notice. Whatever usually happens in the course of business, whether of public office or of private affairs may be presumed to happen on proof of facts out of which the presumption can legitimately arise. The deposit of a letter in the mail, duly addressed and stamped, will undoubtedly raise a presumption that it reached its destination in the due course of the mails. There are many like instances in the course of business affairs which would serve to illustrate the same proposition. To state generally, that whenever evidence is given the jury may infer therefrom any fact which they think reasonable is an inaccurate expression of the rule. The inference must of necessity flow from the fact and be a legitimate inference under the principles which govern the introduction of testimony. It is not every inference which the jury may think deducible from the facts which they have a right to take as a basis for their verdict. This would leave the determination of causes too much to conjecture and relieve them from the yokes of the law which they are only too willing to shake off, and act on their own notions of what is right and wrong regardless of the proof.

This somewhat lengthy résumé of the case indicates the mature convictions of this court respecting the present record and indicates the lines along which, according to this opinion, the case should be subsequently tried. What has been said will enable the trial court to avoid the difficulties into which it fell and eliminate the errors which have compelled us to reverse the case. The judgment of reversal will be adhered to, though with such modifications of opinion on specific propositions as are apparent from this decision.

*Reversed.*

WILSON, J., not sitting.