**INGALLS IRON WORKS COMPANY,**
Plaintiff,

v.

**Ellen Gregg INGALLS et al., Defendants.**

**INGALLS IRON WORKS COMPANY,**
Plaintiff,

v.

**Ellen Gregg INGALLS, Defendant.**

**Civ. A. Nos. 7651, 8450.**

*United States District Court*
N. D. Alabama, S. D.
Aug. 18, 1959.

See also 152 F.Supp. 523.

Charles W. Greer, Harvey Deramus and Harvey Elrod, of Deramus, Fitts & Johnston, and Donald W. Strickland, Birmingham, Ala., for plaintiffs.

Lange, Simpson, Robinson & Somerville, James A. Simpson, and Reid B. Barnes, Birmingham, Ala., for defendants.

William K. Murray, Birmingham, Ala., for intervenors, Elesabeth Ingalls and Barbara Gregg Ingalls.

**154**

Spain, Gillon & Young, Birmingham, Ala., for Hamilton Nat. Bank, trustee, intervenor.

GROOMS, District Judge.

The Court, having heretofore entered its Findings of Fact, Conclusions of Law, and Interlocutory Judgment, and having this day rendered its final decree herein, deems it appropriate to state its views of the applicable legal principles involved.

### Propriety of Procedure Employed

■ The Ingalls Iron Works Company, "respondent" to the consolidated petitions of Ellen Gregg Ingalls and James A. Simpson as Executors (defendants and counterclaimants in Civil Action No. 7651) and of Ellen Gregg Ingalls in her individual capacity (defendant and counterclaimant in Civil Action No. 8450), challenges the jurisdiction, authority and power of this Court to entertain a proceeding in these two pending original actions to enforce a written agreement of compromise and settlement, entered into in open court between the parties to both said actions, deposited with the Court as evidencing an agreement of compromise and settlement having for its purpose the final termination of both of said actions, and providing that this Court should at the instance of either party fix and determine the time for performance of said agreement. Ample authority is found not only for entertaining a proceeding in the original action to enforce an agreement for compromise and settlement of the subject matter of such action, but also for the more simple procedure of a motion or petition to effectuate such enforcement; 15 C.J.S. title Compromise and Settlement § 48, page 770, citing authorities: McKenzie v. Boorhem, D.C.W.D.Ark., 117 F.Supp. 433; Beirne v. Fitch Sanitarium, D.C.S.D.N.Y., 167 F.Supp. 652.

It is further observed that the proceeding in general conforms to Rule 15(d) of the Federal Rules of Civil Procedure, 28 U.S.C.A., conferring the power to allow supplemental pleading in order to assert a right occurring subsequent to the filing of the original action. This procedure has ample precedent in Federal practice, even antedating the adoption of the present Federal Rules.

Perhaps the leading Supreme Court case on the matter is Knott v. Chicago, etc. Railroad Co., 1912, 230 U.S. 474, 33 S.Ct. 975, 978, 57 L.Ed. 1571. The Court, in the first paragraph of the opinion of Mr. Justice Hughes, said:

"The contention of the appellants that the court erred in permitting the filing of the amended and supplemental bills is without merit. Although the commodity rate act of 1907 repealed that of 1905, it saved the penalties and liabilities incurred under the repealed statute. Both the original and supplemental bills proceeded upon the broad ground that the returns of the companies from their intrastate business, prior to the act of 1905, were unreasonably low, and that any reduction in rates would only diminish the income, already inadequate. The additional legislation pending the suits, and the substitution of slightly higher rates on certain commodities embraced in the earlier act, did not alter the essential features of the controversy. There was identity of parties and subject-matter, although nominally different acts were involved. To have required original bills would have involved double litigation, double costs, and great delay. The ends of justice were advanced by allowing the amended and supplemental bills, and we are not inclined to interfere with the reasonable discretion of the trial judge in a matter of practice which in no way violated any of the substantial rights of the appellants."

The defendants and counterclaimants in the two original actions were granted leave to seek enforcement of the contract of settlement by petition. As to the propriety of such a petition as ancillary to the jurisdiction in the original action, 15 C.J.S. Compromise and Set-

tlement § 48, page 770, has this to say in part:

"A compromise agreement ordinarily may be enforced by petition or motion in the original action asking for such enforcement, and if the agreement is filed with the papers in the cause, no further pleading would seem to be necessary, unless, perhaps, some fact affecting the decree to be rendered may have occurred after the agreement was executed. Where, pending a suit in equity, an agreement of settlement is made, defendant may obtain a rule to compel plaintiff to enter satisfaction of record on defendant's performance of the agreement, and such rule is not in effect a bill for specific performance, so as to make applicable the principle that a decree will not be entered in such case if it would be unconscionable to do so."

Especially apt is a quotation from the Pennsylvania case of Melnick v. Binenstock, 318 Pa. 533, 179 A. 77, 78, cited in the note under the above-quoted excerpt from 15 C.J.S.:

"A compromise or settlement of litigation is always referable to the action or proceeding in the court where the compromise was effected; it is through that court the carrying out of the agreement should thereafter be controlled. Otherwise the compromise, instead of being an aid to litigation, would be only productive of litigation as a separate and additional impetus."

Federal decisions have approved such a procedure. In McKenzie v. Boorhem, 117 F.Supp. 433, supra, the suit was filed in the District Court seeking to enforce certain contract rights. After the filing thereof the plaintiff by a motion in the same action sought enforcement of an oral agreement between counsel on both sides for a settlement of the litigation and for judgment accordingly. It was contended in behalf of the defendant in opposition to such motion that there was a lack of authority in the attorney for the defendant to settle the matter and also that no settlement had actually been reached. The Court found the facts against the defendant on both issues and entered a judgment for the enforcement of the agreement. The oral agreement contemplated not only the payment of money, but the transfer of stock to the plaintiff. Under the oral agreement the case was to be dismissed, but, the defendant refusing to perform, the Court entered a judgment against him. There is nothing in the opinion which shows even that the agreement was made in the presence of the Court or that by its terms it was to be made a part of the court record. Nevertheless, the trial court enforced its performance by judgment as a means of effecting an end to the litigation.

In Beirne v. Fitch Sanitarium, 167 F. Supp. 652, 653, supra, a personal injury action against several defendants was involved. While the case was awaiting trial the parties reached an agreed settlement as the result of considerable negotiation. A written stipulation was filed, signed by all of the attorneys, settling the entire litigation. The Court, in its opinion, noted:

"The settlement stipulation provided that upon the payments by the various defendants, and the delivery of releases by plaintiffs, an order was to be submitted discontinuing the action. The settlement and stipulation was orally approved by this Court and was filed in the court record. Though no formal judgment was entered at that time the settlement and stipulation had the cloak of the Court's approval. It was negotiated during and encouraged by the pre-trial conference, which is an integral and useful aspect of the procedures of this court."

All of the defendants except Maraventano performed the agreement in due course by payment of the sum agreed to be paid by each. Maraventano, however, failed to pay the amount agreed upon by him and concealed himself in order to evade payment. A motion was filed by plaintiffs for an order authorizing the severance of the action against the de-

156

fendant, Maraventano, and the entry of a judgment against him for the stipulated amount on his part to be paid. Upon a hearing of the motion the Court found that, although under the law of the jurisdiction (New York) an attorney had no implied authority to settle or compromise a claim for a client, the said defendant actually authorized the attorney to make the settlement. The trial Court further said (at page 654 of 167 F.Supp.):

"Moreover, plaintiffs' attorney made repeated efforts to contact Dr. Maraventano in order to collect the agreed amount of the settlement. Dr. Maraventano did not respond in any way. It is a client's duty to express disapproval of a settlement within a reasonable time, if he has a basis for disapproval. If he does not object he makes the settlement his own. In this action there has been no claim either that Dr. Maraventano did not know of this settlement, or that he objected to it. Further, Maraventano's counsel informed this Court that he had authority to settle this claim. Such settlement was arrived at in good faith, and was fair and equitable. A reasonable compromise, even if unauthorized, under special circumstances, should not be disturbed by the Court. Holker v. Parker, 1813, 7 Cranch 436, 11 U.S. 436, 3 L.Ed. 396; In re Gsand, 3 Cir., 1946, 153 F.2d 1001.

"(5) Compromises of disputed claims are favored by the courts. Where the parties, acting in good faith, settle a controversy, the courts will enforce the compromise without regard to what the result might or would have been had the parties chosen to litigate rather than settle. Hennessy v. Bacon, 1890, 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605; J. Kahn & Co. v. Clark, 5 Cir., 1949, 178 F.2d 111.

"(6) The rules of law governing settlement agreements are well settled and beyond dispute. Generally, a settlement agreement may be enforced by motion in the original action. McKenzie v. Boorhem, D.C.W.D.Ark.1954, 117 F.Supp. 433; Eastern Display & Carton Corp. v. Presto Beverage Corp., Sup.App.Term, 1st Dept. 1956, 153 N.Y.S.2d 806; 15 C.J.S. Compromise and Settlement, § 48 (1939).

"(7) Therefore, the action against defendant Maraventano is hereby severed from the above action, and under the established doctrine set forth above plaintiffs are entitled to a judgment effectuating the stipulation of settlement * * *."

The similarity of circumstances surrounding the making of the settlement agreement in that case to those attending the settlement agreement here involved is readily apparent.

The Alabama Supreme Court holds that the remedy, properly treated, to give effect to an alleged settlement agreement is by motion made in the court where the action is pending for the entry of judgment in accordance with the agreement; that it is immaterial what it is called, and that it is not subject to the rules applicable to an original bill requiring an answer or demurrer, or some other appropriate act of pleading. Crawford v. Tucker, 258 Ala. 658, 64 So.2d 411.

Without doubt the procedure adopted here is a sound and necessary one for expediting the end of litigation. If parties to a settlement were relegated to any independent formal proceeding for the specific enforcement of the contract, the ending of the litigation would indeed be prolonged instead of facilitated, with two suits instead of one, especially if under the venue or jurisdiction rules obtaining under particular circumstances two forums were involved, State or Federal. The innocent party seeking the enforcement of the settlement agreement would be faced with the dilemma of guessing which case would take longer, or whether to prosecute one and abandon the other, as a setting of the trial of either should approach.

Authority of Robert I. Ingalls, Jr., to Execute Agreement of March 10, 1959, in Behalf of the Ingalls Iron Works Company.

Suit numbered Civil Action No. 8450 has been pending on the dockets of this court since the 30th day of July, 1956. It is one of many suits mentioned in the Findings of Facts, together constituting what is commonly referred to as the Ingalls family litigation. This action was instituted by The Ingalls Iron Works Company after Robert I. Ingalls, Jr., became the chief executive officer thereof, against his mother, Mrs. Ellen Gregg Ingalls, claiming approximately $60,000 by an account stated. The Court of Appeals held that the facts proven did not amount to an account stated. 5 Cir., 258 F.2d 750. In this suit Mrs. Ingalls counterclaimed a sum of approximately $190,-000 by reason of items incorrectly charged against her, on the account books of the plaintiff company.

There is pending in the Circuit Court of Jefferson County, Alabama, in Equity, a suit by the Executors of the Estate of Robert I. Ingalls, Sr., deceased, against the Ingalls Iron Works Company, No. 93075, seeking to have declared to be the property of said estate 2,287 shares of stock of the company owned by Mr. Ingalls at the time of his death, but which the company claims it has purchased under an option and on which it has refused the executors dividends and other stockholders' rights. This case was, on March 10, 1959, pending on submission on the company's demurrer to the executors' bill before Judge W. J. Haralson, Special Judge, and, as observed from the Findings, has already once been before the Supreme Court of Alabama, its opinion thereon appearing in Ingalls Iron Works Co. v. Ingalls Foundation, 266 Ala. 656, 98 So.2d 30.

There is also pending in this Court a suit by The Ingalls Iron Works Company against the Executors of the Estate of Robert I. Ingalls, Sr., Deceased, seeking to recover a judgment for something in excess of $200,000, alleged indebtedness of Mr. Ingalls to the company at the time of his death. This suit is numbered 7651. In it is a counterclaim by the executors seeking the same relief with respect to the same 2,287 shares of stock as is sought by them in State Case No. 93075. This counterclaim was filed on the 27th day of April, 1954.

Civil Action No. 8450 in this court was duly set for trial on the jury docket of this court for March 4, 1959. Counsel for both parties appeared, announced ready for trial and before trial was actually entered upon engaged in a discussion of settlement. These discussions, many of which were in the presence of the Court, continued over a period of approximately a week, the Court allowing the parties such time as appeared desirable to enable them fully to explore the possibilities of settlement. During their negotiations for settlement, counsel representing the executors and Mrs. Ingalls were requested by counsel for The Ingalls Iron Works Company to consent to a continuance of Civil Action No. 8450. Counsel for the executors and Mrs. Ingalls, however, expressly refused to agree to a continuance of this case, and furthermore stipulated that if any settlement of this case was arrived at, it must also include a settlement of all the Ingalls family litigation, including the aforesaid State and the two Federal cases. It was understood by all parties that unless all the Ingalls litigation was settled, the company would have to go to trial on the case set March 4, 1959, and reached peremptorily March 10th.

In this posture of affairs, the company was represented before this Court by Robert I. Ingalls, Jr., the Chairman of its Board and its Chief Executive Officer, and by its Director and General Counsel, at that time a full-time member of its staff, D. W. Strickland, and by its regularly employed counsel, Harvey Deramus, and his associates, and by the company's counsel, C. W. Greer, who had represented Mr. Ingalls, Jr., through much of the Ingalls family litigation.

The executors, consisting of Mrs. Ellen Gregg Ingalls, and James A. Simpson, were present in court in person and

were represented by their attorneys, Messrs. Reid B. Barnes and James O. Haley. As the Court was commencing the trial of Civil Action No. 8450 and its counterclaim on March 10, 1959, the above-mentioned parties and attorneys stated to the Court that they had arrived at a settlement of all of the Ingalls litigation. They proceeded in chambers and in the presence of the Court to reduce their agreement to written form. It is upon this agreement that this proceeding is based. The continuance of Civil Action No. 8450, including the trial of the counterclaim, was induced by and directly resulted from this settlement. The same parties who participated in the settlement and induced the continuance now assert their lack of authority to execute the agreement. The corporation now speaks through the same persons through whom it spoke at the time of the settlement.

The total outstanding stock of the company was 15,000 shares. The company claimed only 12,713 shares as outstanding. Before the Court when the settlement was made was Robert I. Ingalls, Jr., the owner of 4,501 shares, Ellen Gregg Ingalls, the owner of 1,407 shares, and the 2,287 shares in dispute between the parties before the Court, making a total of 8,195 shares, which number was more than half the company's stock under any theory of ownership.

The evidence shows that the company and its counsel zealously championed the retention of all of the stock of the company in the Ingalls family. The Directors of the company, other than Mr. Ingalls, Jr., were not stockholders but were employees of the company, beholden for their jobs and pay directly to Mr. Ingalls, Jr., the dominant one of the stockholder group and the company's chief executive officer.

The company was confronted by the immediate trial of said Civil Action No. 8450 in which its basis for a stated account had been held insufficient by the Court of Appeals; it was likewise confronted with the immediate possibility that Judge Haralson might momentarily hand down a decision on its demurrer in State Court case No. 93075.

The Bylaws of the company, as amended on January 13, 1953, named Mr. Ingalls "Chief Executive Officer" of the corporation and gave him very broad powers.[1]

In McCartney v. Clover Valley Land & Stock Co., 8 Cir., 232 F. 697, 701, the Court said:

> "The executive officer of a corporation is something more than an agent. He is the representative of the corporation itself."

Other pertinent statements are set out in Footnote [2].

---

1. "Duties of the Chairman of the Board of Directors. (a) Subject to the general control of the Board of Directors and Executive Committee, the Chairman shall be the Chief Executive Officer of the Corporation and shall have general management of the business of the Corporation. He shall see that all orders and resolutions of the Board of Directors and the Executive Committee are carried into effect. He shall execute all authorized contracts, agreements, deeds, mortgages, and other obligations and instruments in the name of the Corporation and affix the corporate seal thereto when authorized by the Board of Directors or by the Executive Committee. He shall have general supervision of the other officers, agents and employees of the Corporation and shall see that their duties are performed. He shall have all power and shall perform such duties as are regularly and customarily performed by the Chief Executive Officer of the Corporation, and may delegate such of his duties as he may see fit to delegate to the President of the Corporation or to the Executive Vice President or other Vice-President thereof."

2. "However, statutes requiring an agent's authority to execute a contract to be in writing do not apply to executive officers of a corporation."—Fletcher (Perm.Ed. 1954 Rev.), § 444, p. 343.

"* * * if by reason of an emergency or by necessity it becomes impossible for an agent to protect his principal's property or interests by a strict compliance with his usual or regular authority, the scope of his authority is extended or

There was no request that the execution of the settlement be postponed pending the convening of a formal meeting of the Board; and the evidence fails to reveal any attempt to assemble the Board of Directors to obtain formal action upon the settlement before its execution, although it appears that all the directors, except Mr. Taylor, very soon became aware of the settlement.

Apposite to the issue of the authority of executive officers of a corporation is the case of Perryman & Co. v. Farmers' Union Ginning, etc., Co., 167 Ala. 414, 52 So. 644, where the Court said:

"It appears from the plaintiff's evidence that the directors of the defendant corporation, after the purchase and after the machine was ordered to be shipped to the purchaser, met and disapproved the purchase and order which had been theretofore made by its president, secretary, treasurer, and some other director."

After discussing early Alabama cases, the Court added:

"The Supreme Court of the United States in the case of Bank of U. S. v. Dandridge, 12 Wheat. 64, 6 L.Ed. 552, speaking to the same subject, announced the same propositions as follows: 'Persons acting publicly as officers of the corporation are to be presumed rightfully in office; acts done by the corporation, which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter * *. If officers of the corporation openly exercise a power which presupposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed * * *.' "

The fact that the company's board of directors had adopted a resolution withholding the power of even its top officer from dealing with "Treasury Stock" would indicate that he had the power with reference to other stock, such as that here in dispute.[3]

■ While Mr. Strickland, General Counsel, and Mr. Greer, counsel for Mr. Ingalls, Jr., and the company through years of this family litigation, and Mr. Deramus and his associate, Mr. Lavender, counsel for the trial of this litigation, did not sign the contract of agreement, they participated in the making thereof and its signing by their client. The Court is aware of the general principle that attorneys may litigate but may not settle controversies. However, as far back as 1813, in the case of Holker v. Parker, 7 Cranch 436, 3 L.Ed. 396, Chief Justice Marshall abated the rule measurably. He used this language:

"Although an attorney at law, merely as such, has, strictly speaking, no right to make a compromise; yet a court would be disinclined to disturb one which was not so unreasonable in itself as to be exclaimed against by all, and to create an impression that the judgment of the attorney has been imposed on, or not fairly exercised in the case."

Here making the settlement for their client we have the company's chief law

___

varied to fit the circumstances, and the officer or agent who then acts in good faith and with reasonable discretion, in so acting, is still held to be acting for his principal with authority to bind him by his acts." Id. § 443, p. 333.

"In order to bind the corporation by his acts, there need be no express authority from the Board of Directors, but it may be implied, since 'the corporation is as much bound as a natural person by duly implied authority of its agents, as well as by authority expressly given.' " Id. § 437, p. 323.

3. " * * * every delegation of authority, whether general or special, carries with it, unless the contrary be expressed, implied authority to do all those acts, naturally and ordinarily done in such cases, which are reasonably necessary and proper to be done in order to carry into effect the main authority conferred." Fletcher (Perm.Ed.), § 440, p. 327.

officer, another advisory attorney who sits in at the company's directors meetings and who has a complete familiarity with all the matters in controversy, and other able counsel engaged to handle this litigation. They would appear as more than "an attorney at law, merely as such". There is no contention, furthermore, that any of the company's counsel were imposed upon or that their judgment was not fairly exercised for their client.

Holker v. Parker, supra, is still the law. It is quoted with approval in In re Gsand, 3 Cir., 1946, 153 F.2d 1001. It is the first case treated in the note in 66 A.L.R. 107, and is quoted from at page 111 at length.

In Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751, 755, a corporation represented by its general manager, named Paull, and counsel entered into an agreement of settlement before the Court. The Court said:

"Here a stipulation was made in open court and spread upon the record whereby appellant, represented by its active general manager and two able attorneys, agreed to accept the sum of $2,500 in full settlement of its cause of action, to dismiss the suit and to execute a release, and respondent agreed to pay that sum. The stipulation was not made until the trial court had assured itself that it was fully understood by both the Paulls. Such a stipulation should be as binding as a written contract; indeed, it is a contract but made with more solemnity and with better protection to the rights of the parties than an ordinary contract made out of court."

In Carstens v. Schmalholz, 16 Daly 26, 8 N.Y.S. 529,[4] which was a case where the attorneys for the respective parties, with the full knowledge and consent of the parties entered into a written agreement settling all their differences, including a claim for work and labor for which a recovery was not claimed in the suit. The Court said:

"The respondent contends that it was not valid, because made by the attorneys, and not by the parties, and that they cannot bind their principals for anything outside of the matters then in suit in the city court. In this we think he is mistaken."

The attorneys had negotiated and reached this settlement, Mr. Ingalls was in court as the representative and alter ego of the company. The whole transaction occurred with his full knowledge and understanding. As was said by the New York Court in the case just quoted from, this is a settlement by attorneys made with the full knowledge of the client. It is, therefore, not the ordinary case where an attorney, without the knowledge of his client, assumed to act for his client in settlement of a lawsuit. It is a case where an attorney charged with the duty of handling this litigation and an attorney occupying the office of Chief Legal Counsel made a settlement, but only after and with the approval of their client and employer.

The corporation supplied Mr. Ingalls, Jr., as its alter ego, representing it on matters during the trial. A situation arose during the trial where the case must be settled or must go to the arbitrament of a jury verdict. No one questions his authority or Mr. Strickland's authority, or that of other counsel, to submit the company's liability to the decision of the jury. The attorneys agreed upon a settlement. The corporation, by its alter ego, with full knowledge, approved it.

The Court is of the opinion that Mr. Ingalls, as chief executive officer of the corporation, had the authority to make this settlement, also Mr. Strickland, its general counsel, and likewise other counsel, with the knowledge and approval of

4. See, also, Southern Kansas R. Co. v. Pavey, 57 Kan. 521, 46 P. 969, where a settlement was upheld where the client had knowledge that their counsel had entered into the settlement, and Aiken v. National Fire Safety Counsel, Del.Ch., 127 A.2d 473, and Sacco v. Polser, 9 Misc.2d 211, 166 N.Y.S.2d 674.

the corporation's representatives in court.

### Affirmation and Ratification by the Board by Failure to Disaffirm Within a Reasonable Time

In connection with the question of the authority of Robert I. Ingalls, Jr., as the Chairman of the Board and Chief Executive Officer of the corporation, to bind the company, reference has been made to the case of Perryman & Co. v. Farmers' Union Ginning & Mfg. Co., 167 Ala. 414, 52 So. 644. That case followed closely Bibb v. Hall and Farley, 101 Ala. 79, 14 So. 98, 101. In the opinion in the latter case, the Court made a statement of general principle very pertinent to the question of ratification of a contract made in behalf of a corporation without authority, as follows:

" 'Morawetz lays down the principle that a corporation has implied authority to conduct its business on liberal principles, and may generally do what an intelligent man would do under similar circumstances. 1 Mor. on Corporations, § 365; 1 Am. & Eng.Encyc.Law 369. While, therefore, the officers of a corporation are not free from all obedience to form, so as to be independent of the governing body, and cannot perform acts which are ultra vires, and while there are many things which, if they do, will not be recognized as binding on their principals, yet, while they act in the line of the business of their companies, without express authority, but manifestly for their interest, *it will require but little to show the approval or ratification of the companies.* 2 Mor. Corp. § 675. It is elementary, that an act done by one, representing himself as the agent of another, which he had no express authority from his principal to do, may be ratified by the party for whom he assumed to act. Ratification may be done expressly, or by mere acquiescence or a failure to repudiate the act, knowing it to have been done, and as effectually by the one as by the other mode. 2 Kent, 616; Story on Agency, §§ 239, 255, 256; 2 Mor. Corp., 627; 1 Beach Corp., § 195; Lyndeborough Glass Co. v. Mass. Glass Co., 111 Mass. 315; Olcott v. Tioga R. Co., 27 N.Y. 546; 17 Am. & Eng.Encyc.Law, [pp.] 127, 162, 163.' " (Emphasis Added.)[5]

In the Court's opinion, the evidence in this case demonstrates that the corporation received a benefit from the silence of the board of directors, officers and attorneys of the corporation from March 10, 1959, until a time approximating May 25, 1959, and its failure to disaffirm on the ground of lack of authority. During that time, as the Court stated, the sole ground of objection communicated in any manner from the corporation to the defendants and counterclaimants, or

---

5. See Mobile & Montgomery Railway Co. v. Gilmer, 85 Ala. 422, 5 So. 138, 141, where a deed conveying to the railroad company the right of way through the lands of the grantor, and a written instrument executed to the grantor of the land, in the name of the company by its President (Pollard), containing covenants running with the land in favor of the grantor, were executed contemporaneously and as a part of the same transaction. A suit was brought by the grantor against the railroad for breach of the covenants running with the land, and it was contended on the part of the railroad company that the President had no authority to execute that particular instrument for the corporation, and that such action had not been duly ratified.

On the question of ratification, the Court said:

" * * * The knowledge of Pollard, president, and of Jordan, as general superintendent, who are shown to have had full parol authority to arrange all rights of way, and who together made this contract, must be construed to be the knowledge of their principal,—the company. The acceptance of the deed, with the benefits of the contract, and possession under it by the railroad, was a full ratification of the act of its agent, and estopped that corporation from denying the fact of the agent's lawful appointment, as well as his authority to act in the premises. Ala. G. S. R. Co. v. South & N. A. R. Co., 84 Ala. 570, 3 So. 286. * * * "

their attorneys, was the expression of a doubt of the power to make the stock subject to an option as agreed upon in the written contract. It clearly appears that had it been made known to the defendants and counterclaimants (petitioners) during the jury term of this court, which lasted during the entire month of March, 1959, that the corporation had disaffirmed, or reserved the right to disaffirm, on the ground of lack of authority, the defendants and counterclaimants would have been in a position to press for and obtain a trial of Civil Action No. 8450. The corporation thus received a benefit for the continuance of this important case, in which Mrs. Ingalls was claiming a substantial amount of money by counterclaim, and unquestionably Mrs. Ingalls suffered a detriment thereby.

Furthermore, the Court is of the opinion that the executors suffered a detriment as the result of the communication to Judge Haralson, the presiding judge in the State Court case involving the validity of the option (the subject matter of Civil Action No. 7651), notifying him of the settlement of the case, and of the cessation of all work and activity by the Circuit Judge in that action from that time on, with a resulting delay in the prosecution of that case, which might and should have been prevented by a prompt disaffirmance by the corporation of the contract of settlement.

The Court comes to the question then as to what knowledge the directors acquired of the fact of the contract, what they did or did not do thereafter, and what they had the opportunity to do either after the acquisition or valid imputation of such a knowledge, as the case may be. Under the rule that the corporation must disaffirm within a reasonable time, or a ratification results, the authorities are that what constitutes a reasonable time cannot be definitely stated and must necessarily depend upon the situation of the parties and circumstances of each case; Fletcher, Volume 2, page 1136, § 772. Failure to disaffirm within two months, or even a delay of only one month, has been held ratification in particular cases (page 1136). It is the Court's opinion that in this case the delay of at least two and one-half months, without a disaffirmance, provided that requisite knowledge was present, would effect a ratification, in this matter of extreme importance to all parties concerned.

While there are statements in the text and cases that the principal must have full and complete knowledge of all of the material facts connected with the transaction to which it relates (Fletcher, § 756, same volume), this is not inconsistent with another rule that knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery, will be deemed to constitute actual knowledge.

In Section 757, Volume 2, page 1082, Fletcher, it is said in part:

"Knowledge on the part of a corporation sufficient to make out a case of ratification of the unauthorized acts or transactions of its officers or agents must be actual knowledge, though if the circumstances are such as to put a reasonable person on inquiry, the corporation will be deemed to have knowledge of any facts such inquiry would disclose."

On that subject the author further states (pp. 1083, 1085):

"Ordinarily, however, 'the circumstances which put a corporation upon inquiry are the same as those which will put an individual upon inquiry.' (Seymour Improvement Co. v. Viking Sprinkler Co., 87 Ind. App. 179, 161 N.E. 389.) Accordingly, if their ignorance was due to negligence and inattention in the discharge of their duties and third persons have acted in reliance on their apparent knowledge and acquiescence, the corporation may be estopped to deny that the contract was authorized or ratified." [6]

6. Citing, with other cases, Mobile & Montgomery Railway Co. v. Gilmer, 85 Ala. 422, 5 So. 138. Footnote 5, supra.

■ As a condition to ratification of a contract through knowledge and acquiescence on the part of the directors, it is not necessary that notice thereof shall be given them sitting as a board. "It is sufficient if they are personally cognizant thereof and do not call a meeting to disavow it," (Section 759, page 1091, Fletcher, Volume 2; Fletcher citing cases (under Note 33)—Henry v. Colorado Land & Water Co., 10 Colo.App. 14, 51 P. 90; Kelsey v. National Bank of Crawford County, 69 Pa. 426; since as stated in Seymour Improvement Co. v. Viking Sprinkler Co., 87 Ind.App. 179, 161 N.E. 389, 401:

> "The law imputes to a corporation knowledge of facts which its directors ought to know, in the exercise of ordinary diligence in the discharge of their official duties, when the imputation of such knowledge to the corporation is necessary to protect the rights of third persons. The directors are presumed to know that which it is their duty to know and which they have the means of knowing. 3 Thompson on Corporations (3rd Ed.) § 1783."

All of the directors of The Ingalls Iron Works Company, except one (Mr. Jerome Taylor, who was out of the country), acquired knowledge of all of the actual terms of the written contract either the next day after the execution on March 10th, or within a very short time thereafter. All of the directors were officers or employees of the company, and were on the ground, so to speak. Mr. Ingalls was Chairman of the Board of Directors. Mr. Strickland, the general counsel, was a member of the board.

Mr. Ingalls took with him, after signing the agreement, an unsigned copy thereof, and placed it in his desk at his office. He talked to several officials and the directors, including Mr. Palmer, who is President. Mr. Palmer first learned about the agreement early the next morning, March 11th, when Mr. Ingalls telephoned him. Mr. Mayo was shown a copy of the agreement and he read it, and it appears that Mr. Mayo was fully apprised of the terms of the settlement prior to the meeting on March 19th, as were all of the directors except Mr. Taylor. The board of directors then consisted of Mr. Ingalls, Chairman, Mr. Strickland, Mr. Mayo, Mr. Palmer, Mr. Lanier and Mr. Taylor. Whatever the directors may have been told as to whether the settlement had to be approved by the board of directors, the matter was of such vital importance as to alert all of them and place them upon duty of inquiry, to ascertain the true facts, from the Court, if necessary. At the meeting of March 19th, nine days after the execution of the contract, they had the opportunity to ratify or to repudiate the transaction. They took no formal action respecting same.

■ Furthermore, it is the Court's opinion, in accordance with the Court's Findings, that the knowledge acquired by the attorneys for The Ingalls Iron Works Company, Mr. Strickland, its general counsel, and Mr. Greer and Mr. Deramus, who represented the corporation in both of these Civil Actions, that Robert I. Ingalls, Jr., as chief executive officer of the corporation, had purported in its behalf, by his execution of the written instrument of March 10th, to make a binding contract of settlement for the company, was imputable to the corporation, regardless of the knowledge actually acquired by the directors, placing upon the corporation, through its directors or otherwise, the duty to disaffirm the contract within a reasonable time, which the corporation did not do. The general rule that knowledge acquired by an agent in the course of his agency and employment is imputable to the principal as a matter of law, is applicable to knowledge acquired by an attorney; Waters v. American Cas. Co. of Reading, Pa., 261 Ala. 252, 73 So.2d 524 (Headnote 22). See cases in the Alabama and Southern Digest, Attorney and Client, ⊕104. While it has been held that knowledge of the president of a corporation who has signed a contract without authority of the directors, is not

**164**

knowledge on the part of the corporation where the other stockholders and directors have no actual knowledge of it (Fletcher, Volume 2, § 759, page 1089), there is strong authority for the proposition that the knowledge, in the absence of fraud, of an officer or agent who did not make the unauthorized contract, but who acquired knowledge of the fact of its execution or making, in the course of his employment, is imputable to the principal as a matter of law. Beacon Trust Co. v. Souther, 183 Mass. 413, 67 N.E. 345 (Headnote 4); O'Connor v. Metropolitan Life Ins. Co., 121 Conn. 599, 186 A. 618; Austell Bank v. National Bondholders Corp., 188 Ga. 757, 4 S.E.2d 913.

The Court is of the opinion that apart from any question of the authority of Mr. Ingalls to execute the Contract of Settlement, the contract is binding upon the corporation because of the failure of the corporation, or its directors, to disaffirm it within a reasonable time.

Power of an Executor or Trustee to Grant an Option as a Part of a Compromise and Settlement of a Disputed Claim.

 The main objections of the respondent to the enforcement of the agreement of settlement are that neither the executors [7] nor the trustees under the will of Mr. Ingalls have the power or authority to make the stock subject to such option. It is contended that, while there is a power of sale contained in the will of Mr. Ingalls, both to the executors and trustees, to sell the assets of the estate or Trusts, this does not carry with it the power to grant an option to purchase. This contention not only discounts the very broad powers [8] vested in the executors, but also draws the curtain over the facts that generated this controversy.

A look at the record reveals that Mr. Ingalls, Sr., gave the plaintiff an option to purchase the stock here involved,[9] or any part thereof, at any time during his life and for thirteen months thereafter. His executors were bound by the option and were required to transfer and deliver the certificates to the plaintiff in the event it elected to purchase all or any part of the stock. The purchase price was $470 per share, or a total of $1,080,000. Within a few days after Mr. Ingalls' death, and on several occasions thereafter, the board of directors of plaintiff released the right to exercise the option. A reconstituted board, on December 30, 1952, attempted to rescind the resolution of the old board releasing the option, and sought to exercise the election to purchase. The history of the struggle that ensued is recited in Ingalls Iron Works Co. v. Ingalls Foundation [9].

By the contract of settlement, and following the pattern originally em-

7. Mr. Ingalls' will provides that his executors shall have and may exercise all the rights, powers, and duties granted to or conferred upon his trustees.

8. Item Nine (b) authorizes the trustees "to collect all debts and enforce all obligations of every kind in my favor * * * by such means and processes as to them, in their judgment and discretion, may seem necessary and proper; with full power to compromise and adjust any such debt or obligation as in the discretion of the trustees may best conserve the interest of said trust * * to exercise all and singular the rights, powers and privileges incident to the ownership of stock, bonds and other securities constituting a part of the trust estate, in accordance with their judgment and discretion; and, generally, as to every part and parcel of the money, choses in action, and other personal property subject to said trust, to do and to have done any and all things which to them, in their judgment and discretion, seem necessary to protect and conserve the interest of the trust."

Item Nine (c) authorizes the trustee "to sell, assign, transfer, convey and deliver, and mortgage, pledge or hypothecate all or any part, or parcel of the property, real, personal, or mixed, constituting the corpus of said trust, which, in their judgment and discretion, should be sold * * * for such consideration as they may, in their judgment and discretion, accept * * *."

9. See Ingalls Iron Works Co. v. Ingalls Foundation, 266 Ala. 656, 98 So.2d 30, where the option is set out verbatim.

ployed,[10] the executors grant an option to the plaintiff to purchase one half of the shares (1,143) which, before the original option was released by the corporation, plaintiff had a right to so purchase, and with which sale the executors were required to comply.

To conclude that the executors, to conserve and to enhance the estate, are without power under the trust indenture to do what they would have been obliged to do in the first instance, the Court must sidestep the provision of the indenture and ignore the history of this litigation.

Though dealing with a short term option, the Supreme Court of Missouri, in Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S.W. 744, 756, following an exhaustive review of the authorities, held that a trustee holding stock, had, under the power of sale conferred by the will, the right to grant an option to purchase as one of the ordinary methods of sale. In its opinion, it said:

"Opposing plaintiff's contention, defendant maintains that, where the authority is general to perform and carry out a particular object, *a resort to the ordinary and usual methods or means comes within the scope of the power, and it will always be inferred that a testator intended to give his trustee every authority which is necessary for his declared purpose.* Defendant's contention in this respect seems to be amply supported by authority. Faulk v. Dashiell, 62 Tex. [642], loc. cit. 648, 50 Am.Rep. 542, and cases there cited; In re Cardon's Estate, 278 Pa. 153, 122 A. 234; Schloendorn v. Schmidt, 115 Md. [74], loc. cit. 79, 80 A. 309, and cases cited; Preston v. Safe Deposit & Trust Co., 116 Md. [211], loc. cit. 217, 81 A. 523, Ann.Cas. 1913C, 975; Smith v. Allen, 86 Mo. 178." (Emphasis supplied.)

In Crown Co. v. Cohn, 88 Or. 642, 172 P. 804, 806, the Oregon Supreme Court sustained the right of trustees in a thirty year lease to give an option of purchase for a period of ten years [11] in consideration of the erection of a building on the realty of a value of not less than $75,000. This grant was under a trust deed empowering the trustees to take possession of, manage, control, lease, mortgage, sell and convey the land constituting the trust estate and invest the proceeds, "as to my trustees shall be deemed advisable." There the trust estate was enhanced in the amount of $75,000. Here the trust estate will be enhanced, and at the same time the threat of damage and destruction to the trust estate by the continuation of the litigation and possible adverse outcome will be removed.

In Equitable Trust Co. v. Delaware Trust Co., 30 Del.Ch. 118, 54 A.2d 733, 737, the Court of Chancery of Delaware held that under a mere general power of sale that the trustee there involved lacked power to grant an option to purchase to another during her lifetime and to her executor within six months after her death. The optionee lived ten years and five months after the option was granted. Her executor sought to exercise the option. Even so, the Court said:

"It may, however, be proper for a fiduciary with a general power of sale to grant an option to purchase property if a sale cannot be otherwise advantageously made and it, therefore, seems prudent to do so. Loud v. St. Louis Union Trust Co., supra; Crown Co. v. Cohn, 88 Or. 642, 172 P. 804; Restat. Trusts, § 190 k; 3 Bogert on Trusts and Trustees, § 741; 2 Scott on Trusts, § 190.8. In other words, if the choice is between a practical inability to dispose of the trust property and

---

10. The agreement provides that: "The details of the new option will follow as far as practical the wording of the option of April 15, 1943."

11. Mrs. Ingalls' life expectancy is 7.11 years. Alabama Acts 1955, page 1314.

the giving of an option to buy it, *which may result in a sale at an advantageous price,* the courts will often construe the language of the *power somewhat liberally.*" (Emphasis supplied.)

The authorities relied upon by respondent deal only with the situation involving assets which are admittedly the property of the estate, and not the situation obtaining here where the title to the property is in substantial dispute and where the parties are embroiled in litigation, upon the result of which there depends the question whether the executors have any title of ownership at all. The rule contended for by The Ingalls Iron Works Company assumes a lack of express power to grant an option, and is not an absolute one, and may be departed from when the circumstances justify such departure. See Scott on Trusts, Volume 2, § 190.8, page 440. There it is said:

"Thus, where the sale could not otherwise be advantageously made, it has been held proper to give such an option," citing Equitable Trust Co. v. Delaware Trust Co., 30 Del. Ch. 118, 54 A.2d 733 (Delaware, 1947); Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S.W. 744 (Missouri, 1926); Connely v. Haggarty, 65 N.J.Eq. 596, 56 A. 371 (New Jersey, 1903), affirmed 68 N.J.Eq. 794, 64 A. 1133 (1905); Crown Co. v. Cohn, 88 Or. 642, 172 P. 804 (Oregon, 1918); see 30 Col. L.Rev. 870 (1930); Meek v. Bennie, (1940) N.Z.L.R. 1.

Viewed from the standpoint of the power of sale alone and the right to grant the option as implied therefrom, it is the Court's opinion that, under the evidence and the circumstances under which the agreement of March 10th was made, this case clearly falls within the exception or qualification of the rule contended for.

Without regard to the specific power of sale, or in connection therewith, it appears that the broad general power given in the last part of section (b) of Item 9 includes the power to grant an option upon any of the personal property of the estate. Quoting the provision:

"* * * and generally, as to every part and parcel of the moneys, choses in action and other personal property subject to said trust, to do and have done any and all things which to them may, in their judgment and discretion, seem necessary to protect and conserve the interests of the trust."

Taking into consideration those powers, including the powers to compromise (and also the inherent power without specific authority to collect, conserve and compromise, as far as the assets of the estate are concerned), the executors are empowered to make the 1,143 shares allocated to Trust 2 subject to the option agreed upon, and this will be accomplished by the putting into effect of the instrument, as amended, executed by the executors and deposited in this Court.[12] The executors in this case, in entering into the agreement of settlement, were not merely attempting to sell or dispose of the stock. They were mainly concerned with recovering and making available to the estate and the beneficiaries of Trust 2, the maximum interest in the stock which they were able to obtain. Presumably, they considered it in the interests of the present beneficiaries of Trust 2, to make the income from the 1,143 shares available during the lifetime of Mrs. Ingalls, and that this was more beneficial to the interest of those beneficiaries, even parting with all interest in this stock. Such an interest in the stock was a very valuable asset. The company insisted, however, in the negotiations and settlement to its having an option to purchase at Mrs. Ingalls' death.

12. Under Title 61, § 365, of the Code of Alabama, as amended, an executor or administrator is authorized to make a partial distribution of the estate without an order of the court.

As stated, by the settlement agreement the estate acquired an ownership, even though limited, which was in dispute and which the estate except for the settlement might have lost entirely. At the death of Mr. Ingalls, Sr., all of the stock, 2,287 shares, was subject to an option at the price of $470 per share, as stated in the Findings of Fact and as set out in full in the Supreme Court of Alabama opinion in the case of Ingalls Iron Works Company v. Ingalls Foundation, Inc. The executors claim that the option was validly released by the company's directors on at least three occasions after the testator's death. The company claims that such releases were invalid and that the option was exercised. This presented a substantial and vital dispute. Had the litigation in the State Court, or in Civil Action No. 7651, in which this dispute was involved, proceeded and terminated favorably to the company, the estate would have had only cash money of $470 per share. By the compromise agreement the estate retains all of the stock until the death of Mrs. Ingalls. Eleven Hundred and Forty-Three shares may then be purchased under the option for $1,000 per share.[13]

By the option agreement, the company has assurance that the Trust 2 stock will not pass out of the Ingalls family at the death of Mrs. Ingalls.

The Court is of the opinion that, regardless of the broad powers conferred upon the executors and trustees of the will, and without such powers, under Alabama law an executor or administrator may compromise and settle any dispute concerning the title to the personal property of the estate of a decedent to the same extent as if he were dealing with his own property, and that a third party dealing with him is fully protected in the absence of fraud or collusion on the part of such third party. Below is a quotation from the latest decision of the Supreme Court of Alabama upon the subject, Arledge v. Ellison, 247 Ala. 190, 193, 23 So.2d 389, 391:

"The ancient rule still pertains: an administrator has the full legal title to the choses in action of the deceased, and is charged with the duty of collecting and reducing them to possession. He may release, compound, or discharge them, as fully as if he was the absolute owner, subject only to his liability to answer to creditors and distributees, for improvidence in the exercise of his power. No bona fide dealing with him can be impeached, no remedy can be pursued against those to whom he may transfer, or to whom he may release, or with whom he may compound, or from whom he accepts satisfaction, of the choses in action, unless fraud and collusion can be imputed to them. Waring v. Lewis, [53 Ala. 615].

"Approval of his acts might also be well rested under section 223, Title 61, Code, providing for the compromising of doubtful claims. While this section authorizes an executor or administrator, by the authority of the probate court, to compromise or settle such claims in the manner directed therein, this Court has held that this does not prohibit the personal representative from, bona fide, settling such a claim without authority of the court. Logan v. Central Iron & Coal Co., 139 Ala. 548, 36 So. 729; Loveman v. Birmingham Ry., Light & Power Co., 149 Ala. 515, 43 So. 411."

Further statements of the law dealing with the power of executors and administrators, or trustees, to compromise are to be found in 21 American Jurisprudence 551, §§ 300 and 301; Carr v. Illinois Central R. Co., 180 Ala. 159, 60 So. 277, 43 L.R.A.,N.S., 634, and Restatement of Law of Trusts, Chapter 7, § 192, page 513.

Under all of the powers which these executors had, conferred by law and also

13. 1,144 shares to be allocated to the marital trust have been willed by Mrs. Ingalls to her two granddaughters.

by will (by the latter in their capacity both as executors and trustees), the Court is of the opinion that the executors possessed the power to subject the stock to the option to purchase agreed upon in the instrument of March 10, 1959.

### Availability of Party's Nonfailure to Perform as Bar to Other Parties' Enforcement of Contract.

 While not originally asserted, the company is now saying that Paragraph 1 of the contract calls for certain acts which the company cannot legally perform, namely, the putting of Mrs. Ingalls on its board and the fixing of her salary. The contract itself shows on its face that this is a severable provision and was not an integral part of the contract in chief, but was a commitment which would be performed *after* the consummation of the contract. The evidence shows that it was regarded as a severable and separate item at the making of the contract; petitioners stated to the Court at the hearing that they did not seek specific performance of this portion of the contract but recognized that for this they must rely on the good faith and integrity of their adversaries. It would be inequitable to allow a party to a commitment of this kind made for the benefit of the other party to take advantage of its nonenforceability in this separable part in this proceeding, to prevent enforcement of the contract as a whole. The Court does not mean to decide that this part of this contract cannot be specifically enforced, but it is not required to determine this because of the voluntary statement of counsel for petitioners at the hearing that this was not insisted upon.

The law of Alabama is clear that contracts such as this may be enforced in part.

In McCreary v. Stallworth, 212 Ala. 238, 102 So. 52, 53, the vendor agreed to sell a certain tract of land, the vendee was ready to take the property and pay the purchase price. The vendor then refused to convey on the ground that he had only an undivided ⅝ interest in the property and the other tenants in common would not join in the conveyance. The vendee then offered to take the ⅝ interest and pay ⅝ of the purchase price. The offer was refused and the vendee brought suit for specific performance offering to pay ⅝ of the purchase price for a conveyance of ⅝ interest. Specific performance was decreed. In an action at law for breach of the option agreement for failure to convey the other ⅜, the vendor set up in bar the decree against him. The Court, in holding the decree effective as a bar, since specific performance of a contract leaves no breached contract, declared:

"A partial failure of title is a complete bar to specific performance at the suit of the vendor. This for the manifest reason that the court will not make a contract for the parties, and require the vendee to accept a conveyance to a less interest than agreed. It is also a bar to full performance at the suit of the vendee. The court will not compel the vendor to purchase an outstanding title, nor cast a cloud on the title of strangers to the suit.

"The vendee may, however, *waive full performance, elect to accept the title which the vendor is able to convey, and maintain a bill for specific performance accordingly.*" (Emphasis added.)

In the early case of Springle's Heirs v. Shields, 17 Ala. 295, it was said that:

" * * * if the vendor have no title to a portion of the land sold, as a general rule the purchaser may have a specific performance of the contract, so far as it can be performed * * *."[14]

14. These cases appear to state the uniform rule on the subject. See especially, Neely v. Broad St. Nat. Bank, D.C. N.J., 16 F.Supp. 839, 840, where it was said:

"It is argued that specific performance cannot be granted because this court has no power to appoint the plaintiff an executor as provided by the terms of the agreement, and, if the agreement cannot

Paragraph 9 of Agreement Respecting Exercise of Power of Appointment by Mrs. Ingalls.

 Paragraph 9 of the agreement of March 10th is as follows:

"9. Mrs. Ingalls agrees, as a part of the consideration of this agreement, that she will by her last will and testament exercise the power of appointment vested in her by the will of her deceased husband with respect to the disposition of the corpus of the aforementioned testamentary Trust No. 1 by irrevocably devising same in the fullest manner she can to her granddaughters, Elesabeth Ingalls Boykin and Barbara Gregg Ingalls in equal shares."

The attorneys for The Ingalls Iron Works Company, contending that Mrs. Ingalls cannot validly contract to exercise the testamentary power given her under the will of her husband, only in favor of her granddaughters, evidently construe the language of paragraph 9 as placing an absolute obligation to make a devise to them and to make such devise irrevocable.

While the authorities are to the effect that the donee of a power of appointment by a will cannot validly contract, and commit himself irrevocably thereby, to bequeath or devise the property which is subject to the power to certain persons (see 41 Am.Jur., § 94, p. 874), Mrs. Ingalls did not, in the agreement of March 10th, make such a commitment. That she did not is demonstrated by the words "by irrevocably devising same *in the fullest manner she can*". On the face of this language, Mrs. Ingalls merely contracted to do only what she was able to do in that regard, without guaranteeing that she had the power to make an irrevocable devise.

The testimony of the general counsel for The Ingalls Iron Works Company, Mr. Strickland [15], shows that both he and

be performed in its entirety, it cannot be performed in part. There are exceptions to the rule thus announced, and; when it appears that the unenforceable part of an agreement is of slight consequence and has no great bearing upon the main objects of the agreement, equity will permit it to be weighed against full performance on the other side and may, as here, conclude that it is not sufficient to deprive the court of jurisdiction."

15. Reference is made particularly to the testimony of Mr. Strickland on pages 192, 193 and 194 of the transcript of the testimony:

"Q. Now did you, Mr. Strickland, ask Mr. Simpson, or did you have any discussion with Mr. Simpson relative to the exercise of the power of appointment by Mrs. Ingalls over Trust 1? A. I mentioned that in connection with—during the discussion. Now my recollection is that that was in Judge Grooms' office. But whether it was during or after we came back in and Mr. Simpson started dictating this memorandum, I do not recall. I do recall pointing out that my associate, Jim Bradford, and I had made some research into that question, and there was a question in our mind as to whether Mrs. Ingalls could obligate herself to exercise the power of appointment in an irrevocable manner.

"And my recollection is that Mr. Simpson said we would work it out some way.

"I don't recall just the point of the discussion when that occurred.

"Q. You do recall that he gave some answer to your inquiry about it, that you had directed to him, about her authority to exercise the power of appointment?

"Mr. Simpson: I object to that as leading.

"The Court: Sustained. That is leading.

"Q. I understand from you that he merely said, 'Well, we can work that out some way,' or words to that effect.

"The Court: I call your attention to this provision in the agreement itself that contains the words 'in the fullest manner she can.' Apparently there was some reservation in the language there.

"The Witness: I think perhaps that— pardon me.

"The Court: Did you have in mind the particular provision?

"The Witness: I am sorry.

"The Court: In giving your answer.

"The Witness: That may be the reason for putting that in there, your Honor, I don't know. I do recall that there was some discussion about it. Whether it

his associate, Mr. Bradford, had looked into this question and that they were both in considerable doubt in the matter, further that this doubt was communicated to Mr. Simpson, attorney for the defendants and counterclaimants, during the negotiations, who stated in effect that the matter would have to be worked out in the light of the existing doubt.

In Western Grain Company Cases, 264 Ala. 145, 162–163, 85 So.2d 395, 413, where it was urged that there was a mistake, the following language is particularly apt:

"In 5 Williston on Contracts, p. 4332, § 1543, it is said:

"'In the first place there must be excluded from consideration mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk. With respect to any matter not made a basic assumption of the contract the parties take their chances. Thus, where a compromise is made, that fact that one or both parties were under a mistake in regard to the claim which was the subject of compromise affords no ground for relief.'

"Two of our cases are cited in support of the foregoing statement, viz.: Carlisle v. Barker, 57 Ala. 267, and Troy v. Bland, 58 Ala. 197. In the latter case the authorities with respect to settlements and compromises are reviewed by Stone, J., and one statement cited with approval is, '*When a compromise of a doubtful right is fairly made between the parties, whether the uncertainty rests upon a doubt of fact or a doubt in point of law, if both parties are in the same ignorance, the compromise is equally binding, and cannot be effected by any subsequent investigation and result.*'

"We quote from 12 Am.Jur., Contracts, § 132: 'Where the parties are

conscious that the existence of particular facts is doubtful and make their agreement on this assumption, the nonexistence of such facts does not affect the validity of the agreement, the risk of their existence being taken by the parties.' Sears v. Grand Lodge A.O.U.W., 163 N.Y. 374, 57 N.E. 618, 50 L.R.A. 204, is there cited as holding that when parties have entered into a contract based upon certain or contingent events purposely as a compromise of doubtful claims arising from them, and there is an absence of bad faith, violation of confidence, misrepresentation, or concealment, if the facts upon which such agreement was founded or in the event of the agreement itself, turn out very differently from what was expected or anticipated, this error, miscalculation or disappointment is not such a mistake as entitles the disappointed party to any relief, either by way of canceling the contract and rescinding the transaction or as a defense to a suit brought for its enforcement."

Mrs. Ingalls has executed a codicil to her will, a true copy of which was introduced in evidence, devising all of the property of Trust 1 to her granddaughters. If this codicil is unrevoked at her death, the appointment made thereby will not be rendered invalid by the fact that she has agreed to make it. 41 Am. Jur. p. 874, § 94, Note 7; 96 C.J.S. Wills § 1070 note 76, p. 729.

### Family Settlement

 This case has been treated as one where the parties dealt at arm's length. For a more cogent reason than has been adverted to, this settlement should be enforced. Sitting on one side of the table in the Court's chambers on March 10th was a mother, over 70 years of age, a widow impleaded in her individual capacity and as the representative of the estate of her husband, the founder

---

was in the early part of the discussion or during the actual dictation of this document, I just can't say.

"I do recall definitely mentioning it to him, and I recall his saying we would work it out in some effective way."

of the business. On the other side of the table sat her son, speaking for the business founded by his father, the stock of which had been given to him and to his daughters, in large measure, by his deceased father. They were there, representing their respective viewpoints, after more than a decade of litigation, bitter and personal, involving the family interest in The Ingalls Iron Works Company.

The litigation, by every measure not only of law, but of morals, ought to be settled, and the courts have recognized that such situations call for extreme measures facilitating and enforcing settlements.

15 C.J.S. Compromise and Settlement § 3b, p. 715, states the rule which is uniformly applied to the compromise and settlement of family disputes, as follows:

"Compromises having for their object the settlement of family difficulties or controversies are favored at law and in equity if at all reasonable, and no rights of creditors intervene; but this doctrine, it has been held, should not be carried so far as to work practical injustice; it should be confined to cases involving the disposition of property in which the members of a family are interested, and should not be extended to personal claims growing out of torts or money demands between members of the family." [16]

Corpus Juris Secundum refers to family settlements again in its chapter dealing with Specific Performance, 81 C.J.S. § 88, p. 605:

"Wherever doubts and disputes arise with respect to the rights of different members of the same family, and a fair compromise is entered into to preserve harmony and affection, or to save the honor of the family, such agreements will be specifically enforced, although resting on grounds which would not be considered satisfactory, if the transaction had occurred between mere strangers."

In Childs v. Julian, 241 Ala. 249, 2 So. 2d 453, 456, the Court employed the following language:

"This court has declared that family agreements by parties who are sui juris, not affected with deception or fraud, with a full understanding of the facts dealing with the common properties, are favored. Such was the decision by Lord Chancellor Hardwicke in Ireland v. Rittle, 1 Atkyns 541, case 256; Neale v. Neale, 15 Eng.Ch.Rep. 673; Betts v. Ward, 196 Ala. 248, 72 So. 110, and cited with approval in Hazen v. Barnett, 50 Mo. 506, and Freeman on Cotenancy and Partitions, § 402; Yarborough's Adm'r v. Avant, 66 Ala. 526, 631; Oliver v. Williams, 163 Ala. 376, 50 So. 937; Hollis v. Watkins, 189 Ala. 292, 66 So. 29."

In Western Grain Company Cases, 264 Ala. 145, 85 So.2d 395, 406, the Court made this succinct statement of the attitude of Courts toward family settlements:

"Courts look with favor upon settlements of litigation especially within families and between stockholders of closely held corporations."

In the Western Grain Company Cases, supra, there was a charge of deceit and undue advantage taken. There is no charge here of imposition, fraud or undue advantage. Two members of the Ingalls family, of the generation concerned, came before the Court asking that the settlement be enforced, and approved its terms. This case as much as any case within the scope of the Court's experience, demands an exercise of the Court's concern for the disposition of family controversies involving family property.

In conclusion, the Court quotes, with but a single comment, the following language of the Supreme Court of Missouri, in State ex rel. Smith v. Mayor, etc., of

---

16. Also, 15 C.J.S. Compromise and Settlement § 9, page 727.

City of Neosho, 203 Mo. 40, 101 S.W. 99, 110:

"The law may be said to be a body of rules primarily intended to prevent litigation; but, if litigation ensues, then these same rules are lamps to guide judicial feet to the goal of justice and get at the very right of the thing in dispute. Hence it is that the law looks with concern on the beginning of litigation and grants its benediction on its close. A compromise is therefore much favored in law, as in the nature of a treaty of peace; and a court will never disturb an amicable settlement, if it can be sustained without overturning settled rules of law."

The law not only grants its benediction to the settlement of March 10th, but, in the Court's opinion, also sanctions its enforcement.