**UNION CAMP CORPORATION,**
**Plaintiff-Appellee,**

v.

**James E. DYAL, Jr., et al., Defendants-Appellants,**

and

**John M. Murrell et al., Additional Defendants,**

**Leon A. Wilson, II, et al., Third Party Claimants.**

**No. 71-1776.**

United States Court of Appeals, Fifth Circuit.

March 24, 1972.

Rehearing and Rehearing En Banc Denied April 28, 1972.

Thomas G. Spicer, Don G. Nicholson, Miami, Fla., Edwin G. Barham, Valdosta, Ga., Nicholson, Howard, Brawner & Lovett, Miami, Fla., for defendants-appellants.

George W. Williams, Robert M. Williams, Bouhan, Williams & Levy, Savannah, Ga., for Union Camp Corp.

Anthony A. Alaimo, Brunswick, Ga., for Mrs. Willie Dyal, ind. and as admx. of estate of Milton Dyal, deceased.

Leon A. Wilson, II, C. Edwin Rozier, Waycross, Ga., for Leon A. Wilson and others.

Malberry Smith, Savannah, Ga., for Julian F. Corish, Atty. of Savannah claimants.

Before MORGAN and CLARK, Circuit Judges and RUBIN,* District Judge.

### ALVIN B. RUBIN, District Judge:

An old saw recites that a bad settlement is better than a good law suit. At age 76, J. Edgar Dyal questions this folk wisdom, and seeks to avoid a stipulation that he expressly authorized his lawyers to sign on his behalf and on behalf of the other defendants, his wife and children and certain other persons who are contingent remaindermen of inter vivos trusts created by him. His wife and children disavow the agreement, Dyal's power to consent to it, and their lawyers' authority to sign it. Four contingent remaindermen of an inter vivos trust created by Dyal, who were named defendants in the suit and had not employed counsel, also object. Union Camp, the plaintiff in this litigation, seeks to enforce the agreement because it is quite clear that a good settlement is better than any law suit.

Determination of the issues concerning the enforceability of the settlement depends on facts not quickly told. Prior to 1941, Dyal had operated a naval stores business and, in connection with it, had acquired extensive lands in Georgia. Among his holdings were contiguous lands comprising 39,283.44 acres, known as Dyal No. 1 (Surrency) Tract, located in Wayne and Appling Counties. On December 15, 1941, Dyal put 10,400 acres of these lands in trust, with Citizens and Southern National Bank, as trustee, for the benefit of his former wife, Ruth, and his five children, Elizabeth Dyal Sammons, Charles Smith Dyal, James E. Dyal, Jr., Milton G. Dyal, and Dorothy Dyal Briscoe. Later that month, he and the trustee signed two agreements with Union Camp, similar in terms, one applicable to 28,883.44 acres and the other applicable to the 10,400 acres held in trust. Each agreement contained a lease for 99 years and an option to purchase the lands after Dyal's death. The purchase price was $15 per acre, and the rental was determined by taking 5% of this amount, 75¢ per acre.

The lessee was authorized, after an initial 7 year growth period to cut specified amounts of timber for commercial purposes yearly. The leases were complex, and it is unnecessary to recite their terms in detail. Each lease provided for termination upon certain specified defaults, including failure to pay rent, provided the owners ended both of them concurrently.

Thereafter, Dyal treated the property retained by him as two parcels, one of 16,000 acres, and the other of 12,883.44 acres. By various donative transfers, he conveyed interests to his children, and to his second wife, Irene Vaughn Dyal. Milton died, Dyal's other children deeded back the fee ownership of some of the

* Hon. Alvin B. Rubin, U. S. District Judge, sitting by designation.

## 682

property to him, and other changes in title occurred, so that immediately before this suit was filed, interests in the parcels were owned as follows:

| Parcel | Fee | Rental |
| --- | --- | --- |
| 16,000 acres | J. Edgar Dyal | Irene Vaughn Dyal |
| 12,883.44 acres | 45/60 by the four surviving Dyal children and Milton's widow, in equal shares | 45/60 same as fee shown in opposite column |
| | 5/60 J. Edgar Dyal | |
| | 10/60 Irene Vaughn Dyal, subject to contingent remainders. Contingent remainders, as to 5/60, if Dyal's wife predeceased him; Dyal's nephews, Ernest Eugene Dyal and Forrest Lee Dyal III, and nieces, Mrs. Barbara Dyal Robinson and Mrs. Kay Dyal Miller. Contingent remainders, as to 5/60, if Dyal's wife predeceased him, the same contingent remaindermen plus Mrs. Hilja Stranden Lahde, Dyal's housekeeper | 15/60 to Irene Vaughn Dyal |
| 10,400 acres | Charles Smith Dyal and James E. Dyal, Jr., successor-trustees for the benefit of themselves and their two sisters. | |

Dyal and two of his sons, Milton and Charles, continued a naval stores operation under yearly contracts with Union Camp until 1967, terminating the business only after Milton's death in October 1966. James E. Dyal, Jr., operated a pulpwood business on the Surrency tract, and contracted with Union Camp to remove and haul the yearly cut of ½ cord per acre from the lands.

There were many other occasions for negotiations between the Dyals and Union Camp through the years. Problems arose from time to time. When they did, Union Camp discussed them with J. Edgar Dyal, and, after they reached an agreement, Union Camp prepared supplementary documents. Every one of these was executed, without exception, by the various lessors, each on his own behalf, and by Union Camp.

Dyal and his first wife were divorced and, he subsequently married Irene Vaughn Dyal in 1935. Thereafter, Dyal's relationship with his children was not always tranquil. Some of his children have never spoken to their stepmother in these 37 years. There were other family differences, and in fact, one lawsuit between them was pending when this suit was filed.

The lands continued to increase in value over the years; indeed Dyal contends they now have a market value of $250 an acre, or a total worth of $10,000,000. Meanwhile, Dyal discovered another cause for difference with Union Camp.

The leases had two provisions regarding fuel wood. With respect to fuel wood removed after the seventh year, and during Dyal's life time, Union Camp was required to pay Dyal ½ the market price of the wood. When the trees were first cut, their stumps remained in the ground. Unlike the stumps of later growth, they became increasingly valuable because of a higher resin content. By the time this suit began, Union Camp valued the stumps at $300,000, and Dyal valued them at $600,000, but Union Camp had let them remain in the ground, contrary to its practice of removing and selling them on all its other properties where Dyal had no share of the proceeds. Supported by the definitions in the lease, Dyal contended that the stumps were fuel wood and that Union Camp had deliberately refrained from selling them in order to avoid paying him a share.

After Dyal had repeatedly asked that the stumps be sold and the proceeds divided with him, in 1969 Union Camp offered Dyal a letter contract with respect to them. But Dyal considered the proposal inadequate, and counsel consulted by him expressed the opinion that Union Camp's failure to harvest the stumps might be a violation of the lessee's obligations, hence cause to terminate the lease. Dyal's lawyer notified Union Camp that he was exercising his option to consider the lease terminated, that he would no longer accept rental payments,

and that he would re-enter and take possession of the lands.

Dyal then sued Union Camp in a Florida state court for termination of the lease and an accounting. Union Camp removed this suit to the U. S. District Court for the Southern District of Florida. Two months later it filed this suit, in Georgia, obtained a temporary restraining order enjoining the defendants both from prosecuting the Florida suit and from molesting or interfering with plaintiff's possession and operations in the lands, except that James E. Dyal, Jr. was permitted to continue performing his pulpwood contract. The suit also prayed for a declaratory judgment that would determine Union Camp's obligations with respect to the stumps; a decree that, if its previous practice with respect to them should constitute a default, Union Camp would have the right to remedy it by paying money damages; and a declaration that Dyal did not have the right to put Union Camp in default. Union Camp additionally sought a declaration that it had the right to possession of the lands and trees, and that its option to purchase was valid. Union Camp did not seek to exercise its option, or to enforce it; only a decree that confirmed its validity.

With their forces thus formed to fight, both sides thought it might be advisable to meet at the conference table. A meeting was arranged on the assurance of the Dyals' counsel that the Dyals would be represented by someone who had authority to speak for the entire Dyal family.

On November 3, 1969, Union Camp's Senior Vice President and Union Camp's lawyers met Dyal, and the Dyals' counsel, and Milton's widow's attorney in Miami, Florida. There was some discussion about another property leased by the Dyal family to Union Camp at Fargo, but Dyal said he was not prepared to discuss the problems arising from that lease. However he represented that he was prepared "to talk as to Surrency, and the whole title at Surrency." He said he owned only 16,000 acres, but he nevertheless was prepared to speak "for the whole crowd."

After some hours of negotiations, the two lawyers representing the Dyals, the lawyer representing Mrs. Milton Dyal, and the representatives of Union Camp reached an agreement. They prepared a document bearing the caption of this suit, and entitled "Stipulation." It recited "that all issues between the parties be settled" by Union's purchase of the full fee simple title to all the lands described in the leases for a total purchase price of $547,965.61 (the option price, at $15 per acre), $150,000 for Dyal's interest in stumps, and a premium for acceleration of the purchase option, $202,034.39. The stipulation required delivery of deeds and provided for termination of the leases.

Dyal read the stipulation at least three times. At his suggestion it was altered to recite that the full value of the stumps was $300,000 and that the sum to be paid in reference to the stumps represented $\frac{1}{2}$ of this amount. Before counsel for the Dyals signed, they asked Dyal specifically in the presence of Union Camp's representatives whether he wanted them to sign. His first answer was, "If that's the best you can do, sign it." One of his lawyers replied: "That's not good enough. You tell (us) to sign it or not to sign it." And Dyal said, "Go ahead and sign it."

After the stipulation was signed, there was a general handshaking. Dyal expressed satisfaction that his dispute with Union was settled. Counsel then began to discuss who would prepare deeds, and who would assume responsibility for getting them signed. One of Dyal's lawyers asked, "Which one of your sons would be the better one to handle getting all these deeds signed?" There was evidence that Dyal said, "I don't know if any of them are going to sign it," but it is not entirely clear whether he was referring to his children or the contingent remaindermen. There was also evidence that Dyal's lawyer said to Union Camp's, "George, if any of them don't sign, you haven't got a deal,"

but the trial court found that this remark was an "off-the-cuff unconsidered speculation on the legal question relating to the mechanics of putting the agreement into effect," and noted the lack of evidence about whether any of Union Camp's representatives heard the remark. While additional evidence by the attorney for Mrs. Willie Eason Dyal that he heard the statement is now tendered, this would not seem to establish its communication to Union Camp's representatives, and it did not qualify Mrs. Willie Dyal's lawyer's own conclusion that there was a firm mutual understanding and meeting of the minds.

Later that day, after the conference was over, and the conferees had departed, Dyal became dissatisfied with the stipulation and notified his attorney that he did not intend to carry it out. Thereafter, Union Camp was notified of his position.

On the date set for performance of the agreement, Union tendered performance. This was accepted only by Mrs. Willie Eason Dyal, Milton's widow, who accepted her proportionate share of the proceeds of the stipulation, as agreed on by Union Camp's counsel and hers, and executed the necessary deeds to convey her interest both in the Surrency and in the Fargo tracts.

Union Camp then filed a motion to have the stipulation made the judgment of the court. New counsel entered the case for the Dyals, and filed amended pleadings challenging, *inter alia*, the sufficiency of service of process and the court's jurisdiction over the persons of Dyal and his wife, Irene Vaughn Dyal. After a lengthy evidentiary hearing, the district judge ordered summary enforcement of the agreement.

## PERSONAL JURISDICTION

■■ The court had jurisdiction of the subject matter of the litigation under the diversity statute because Union Camp is a citizen of Virginia, had its principal place of business in New York and all of the defendants are residents either of Florida or Georgia. 28 U.S.C. § 1332. Most of the defendants were residents of Georgia, hence subject to the territorial jurisdiction of the court. The only defendants who did not reside in Georgia were J. Edgar Dyal, his wife Irene Vaughn Dyal, and one of the contingent remaindermen, Mrs. Hilja Lahde. All of them appeared on November 14, 1969, and filed a motion to dismiss. Mrs. Lahde apparently did not expressly retain the counsel secured by J. Edgar Dyal to act on her behalf, but she has never disavowed this action. J. Edgar Dyal concedes that he authorized the execution and filing of the stipulation, although he seeks to avoid its enforcement. These appearances constituted a waiver of the right to object to the court's jurisdiction in personam,[1] and appear to render moot the argument, much labored by counsel, concerning the validity of the service of process on the non-resident defendants obtained in reliance on the Claims In Rem statute, 28 U.S.C. § 1655.

■ But the service was indeed valid even without the appearances. The suit was brought to enforce a "claim to . . . real . . . property" for Union Camp's claim to the Surrency tract was embracive even though it did not constitute a claim to fee simple ownership. The company had the right to cut timber, to possess the land for 71 more years under its 99 year lease, the option to purchase the fee, the right and

---

1. Rule 12(h) states that defenses of lack of jurisdiction over the person and insufficiency of service of process are waived if omitted from a motion under Rule 12(g). That section states that all motions must be consolidated or they are waived, except for those defenses noted in Rule 12(h) (2) and (3). Moore's Federal Practice

4.02 [3] §§ 1212, 1222, 1223. See Carter v. Powell, 5th Cir. 1939, 104 F.2d 428; Crest Auto Supplies, Inc. v. Ero Mfg. Co., 7th Cir. 1966, 360 F.2d 896; Stavang v. American Potash & Chemical Corp., 5th Cir. 1965, 344 F.2d 117, Cf. Spearman v. Sterling S.S. Co., E.D.Pa.1959, 171 F. Supp. 287.

perhaps the duty (as Dyal contended) to remove even tree stumps. Such a claim, under Georgia law, constitutes "an interest in the property." Ward v. McGuire, 1957, 213 Ga. 563, 100 S.E.2d 276. "A lease for a period of five years or more is an estate for years under the provisions of Code, § 85–801," Ward, 100 S.E.2d at 278. "If it is in lands, it passes as realty." Georgia Code § 85–801. Compare Hamilton v. Young, 5 Cir. 1922, 285 F. 223, holding that service under Judicial Code § 57, the forerunner of Section 1655, was proper in a suit to enforce rights under a leasehold.

It belabors the obvious then to say that Union Camp's right to possess the land was truly in dispute. Dyal had given notice that he would take possession of the lands, and had sued to terminate the leases. If his claims were maintained, Union Camp's right to possess, its right to cut timber, and its option would all end. That it sought at the same time to enjoin proceedings in another forum, a purely in personam claim, would not affect the validity of the service but only the relief that could be granted. This situation is covered in Section 1655 for the statute provides that, if the absent defendant does not appear or plead, "any adjudication shall, as regards the absent defendant without appearance, affect only the property which is the subject of the action."

■ The pendency of the Florida litigation did not prevent the Georgia court from acquiring jurisdiction. At most, the existence of the prior litigation might have served as a ground to dismiss that part of the motion due to lis pendens. See Moore's Federal Practice 3.06 [2], at 737–739; Hammett v. Warner Bros. Pictures, 2nd Cir. 1949, 176 F.2d 145, at 150. Hence, there is jurisdiction as to all the parties.

## II. DID DYAL OR THE DYAL ATTORNEYS HAVE AUTHORITY TO ENTER THE STIPULATION ON BEHALF OF THE OTHER DEFENDANTS?

The stipulation did not purport merely to settle the law suit. It neither con-

firmed the validity of the leases and the option, nor declared their invalidity. It was silent as to all other issues raised in this litigation except Dyal's request to share in the stumpage based on a compromise as to value. In no other way did it compose the issues by determining some of them in favor of one party and others in the favor of another. It did not provide for a cash payment to dispose of some of the contentions made. Instead, as it recites, it settled *all issues* between the parties, not merely those in litigation.

When the conference was arranged, counsel for Union Camp promised that one of its officers who could speak authoritatively for the company would attend, but it agreed to participate only on condition that the persons representing the Dyal interests "were prepared to speak for the whole title and deliver titles to the whole property of Surrency No. 1." That was the purpose and the result of the conference.

■ The stipulation provided for the transfer of title to real property situated in Georgia. Hence Georgia law must be applied in determining its validity as well as the power of agents to execute it. Brown v. C. I. R., 5th Cir. 1940, 180 F. 2d 946; Florida Blue Ridge Corp. v. Tenn. Electric Power Co., 5th Cir., 106 F.2d 913; Restatement of Conflicts 2d §§ 222–226. This rule of *lex loci rei sitae* is also the Georgia statutory rule: "When writings or contracts are intended to have effect in this State, they must be executed in conformity to the laws of this State. . . ." Ga.Code § 102–108. Sims v. Jones, 1924, 158 Ga. 384, 123 S.E. 614. See also Clark v. Baker, 1938, 186 Ga. 65, 76, 196 S.E. 750. And compare Kollock v. Webb, 1901, 113 Ga. 762, 39 S.E. 339, 342; Goodman v. Nadler, 1966, 113 Ga.App. 493, 148 S.E.2d 480; and Pratt v. Sloan, 1930, 41 Ga.App. 150, 152 S.E. 275, where a Georgia court enforced the law of the situs of real property when it was in another state.

■ The district court sitting in Georgia was obliged to follow the Geor-

gia choice of laws rules in determining the validity and effect of the stipulation. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477. See Budget-Rent-A-Car Corp. v. Fein, 5 Cir. 1965, 342 F.2d 509.

A Georgia statute gives attorneys "authority to bind their clients in any action or proceeding, by any agreement in relation to the cause, made in writing, . . ." Ga.Code § 9–605. But the stipulation in this case was not an agreement "in relation to the cause." Nor was it a settlement that disposed of the issues in the proceeding. Cf. Ingalls Iron Works Co. v. Ingalls, N.D.Ala.1959, 177 F.Supp. 151, 5th Cir. 1960, 280 F.2d 423; Cia Anon Venezolana De Navegacion v. Harris, 5th Cir. 1967, 374 F.2d 33. It was a contract to sell lands.

■ A contract for the "sale of lands, or any interest in, or concerning them," Ga.Code § 20–401, subd. 4, "must be in writing, signed by the party to be charged therewith, or some person by him lawfully authorized. . . ." Id. at 20–401. To implement this statute of frauds, Ga.Code § 4–105 provides, "the act creating the agency shall be executed with the same formality . . . as the law prescribes for the execution of the act for which the agency shall be created." This evidently requires that the agent's power to sell land must be in writing, absent later ratification of his acts, Baxley Hardware Co. v. Morris, 1927, 165 Ga. 359, 140 S.E. 869, or estoppel of his principal to deny his authority. See Wade v. Powell, 1860, 31 Ga. 1; Fulford v. Fulford, 1969, 225 Ga. 9, 165 S.E.2d 848. Compare the statements in the following cases that allegedly unauthorized acts of an attorney in making a settlement of litigation in some manner other than by the conveyance of land may not be questioned if there is "unreasonable delay" in acting to correct the improper acts. McCoy v. McSorley, 1969, 119 Ga.App. 603, 168 S. E.2d 202; See Jackson v. Jackson, 1945, 199 Ga. 716, 35 S.E.2d 258; City of Atlanta v. Frank, 1969, 120 Ga.App. 273, 170 S.E.2d 265. Here there can be no question of ratification or delay on the part of any of the Dyals after the stipulation was signed.

Earlier Georgia jurisprudence tended to support the conclusion that an agent's authority to convey real property need not be in writing. Brandon v. Pritchett, 1906, 126 Ga. 286, 55 S.E. 241; (in which however there was also a later oral ratification by the principal) Collier v. Moore, 1923, 31 Ga.App. 227, 120 S.E. 441.

However in Baxley Hardware Co. v. Morris, 1927, 165 Ga. 359, 140 S.E. 869, the court made clear that the authority of an agent to lease the land of another must ordinarily be in writing, but the jury might find oral authority sufficient if the principal was estopped by her later conduct from raising the issue. One day later the Georgia Supreme Court wrote its opinion in Byrd v. Piha, 1927, 165 Ga. 397, 141 S.E. 48, stating, "Where the law prescribes that the act can be executed by the principal only by writing, then the act creating the agency must be executed with the same formality; that is, the agency must be created by writing." Id. 141 S.E. at 50. The earlier opinion in *Brandon* was discussed and the court stated that it would no longer follow that decision.[2] A number of later cases apply the rule that written authority to the agent must be shown to support his sale or lease of the principal's lands. Dover v. Burns, 1938, 186 Ga. 19, 196 S.E. 785; La Rowe v. McGee, 1931, 171 Ga. 771, 156 S.E. 591, 593; Hubert Realty Co. v. Bland, 1949, 79 Ga.App. 321, 53 S.E.2d 691; Meeks v. Adams La. Co., S.D.Ga.1949, 49 F.Supp. 489, 494; See also Butler v. Godley, 1935, 51 Ga.App. 784, 181 S.E. 494.

In Nalley v. Whitaker, 1970, 102 Ga. App. 230, 115 S.E.2d 790, dealing with a lease of realty, the court stated that one entering into a 15 year lease with an

2. Note the extensive dissenting opinion in *Brandon* by Justice Atkinson who was still a member of the court at the time of the *Byrd* decision.

agent "is charged with notice that the agent's authority to execute the lease is required by law to be in writing and is under a duty to inquire and ascertain whether such written authority exists and what the limits of the authority are, and such person is guilty of negligence in failing to make such an inquiry." Id. 115 S.E.2d at 791.

It is in the light of these decisions that we must interpret Fulford v. Fulford, 1969, 225 Ga. 9, 165 S.E.2d 848. It was there alleged that the parties had made a compromise agreement of a suit to set aside a conveyance of real estate by entering into an agreement whereby the land would be reconveyed and then sold; that the agreement had been made when "all the parties with their counsel met in the courtroom of the Wheeler County courthouse. . . ." The defendant demurred to this count on the ground that the alleged compromise was not in writing. The court held that the agreement was not void, because it was "an agreement for the compromise of a pending cause . . . made by a party and his counsel on the one hand, and by the counsel of the opposite party and ratified by his client. . . ." The court's opinion quoted with approval an earlier observation that the requirement of a written power of attorney be in writing has "no application to an oral agreement and compromise of a pending suit. . . ." In *Fulford*, however, title to the property was at issue in the litigation, and all the parties expressly ratified their attorney's settlement. That, too, was the basis for enforcing the stipulation entered by counsel in a land line dispute, Dean v. Jackson, 1964, 219 Ga. 552, 134 S.E.2d 601, where the court found that the client gave express assent to the action taken by his attorney.

The lawyers representing the Dyals never purported to act on their own authority as lawyers, express or implied. They made it clear in the presence of Union Camp's representatives that they were seeking authorization from J. Edgar Dyal, and would sign only if he instructed them.

The trial court concluded also that Dyal was in fact "the agent of all of the defendants in this case" except Mrs. Willie Eason Dyal, and "possessed authority to act for them in all matters pertaining to the litigation including the settlement thereof." But Dyal's agency was more tenuous than the lawyers'; they at least had a written letter of employment. His authority was purely oral.

■ While the evidence with respect to Dyal's actual authority is contradictory, we are not left with the firm conviction that the trial court's finding was clearly erroneous. F.R.C.P. Rule 52; Moore's Federal Practice § 52.03 [1]; see Western Cottonoil Co. v. Hodges, 5th Cir. 1954, 218 F.2d 158; Preston v. Curtiss National Bank, 5th Cir. 1969, 410 F.2d 367; Cf. Seaton v. Sills, 5th Cir. 1968, 403 F.2d 710. But the conclusion reached from this fact does not follow: because J. Edgar Dyal had authority to settle the law suit does not mean that he had power to agree to convey a fee interest in the real property. "An agent is authorized to do, and to do only," the Restatement of Agency 2d § 33 correctly tells us, "what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts." There is no evidence that the Dyal family desired him to sell their interests in the land. Authority to sell the principal's property is inferred only when it is incidental to the transaction, usually accompanies the authority expressly conferred or is reasonably necessary in accomplishing it. Restatement of Agency 2d § 52.

■ The sale of Surrency was not incidental or reasonably necessary to settling the litigation. Indeed the reverse is true: the litigation was incidental to ownership of the fee. Nor does authority to sell a fee in real property usually accompany authority to negotiate for settlement of the type of claim the Dyals were presenting. Authority to act in the principal's business does not usually

imply authority to sell the principal's interest in lands. Restatement of Agency 2d § 52[b]. Dyal's acts suffer from the same defects as his counsels': he acted beyond his authority, and he agreed to convey lands without written authority from his principals. Indeed it does not appear that he had even oral authority to do so.

### III. DID DYAL AND THE LAWYERS HAVE APPARENT AUTHORITY?

■■■■■ The trial court found that Dyal (and the Dyal lawyers) had apparent authority to represent all of the defendants. The source of this authority is found in Dyal's having handled all negotiations with Union Camp for 28 years, from the circumstances surrounding the Miami conference, and from his declarations there that he possessed authority from all the titleholders. But it is commonly held that, if an agent must have written authority to act, he cannot be orally vested with apparent authority, any more than he can be orally vested with a real one. Restatement of Agency §§ 159 and 185. Absent estoppel or ratification, apparent authority cannot remedy the lack of the written power requisite under the statute of frauds.

■■■■ Beyond that, while the evidence does support the conclusion that Dyal had apparent authority to negotiate for his family with respect to the leases and their modification, it does not lead to the conclusion that he ever was held out as having any authority to end the leases or to sell the lands subject to them. The defendants had merely permitted J. Edgar Dyal to negotiate on their behalf with respect to various problems incident to the leases from time to time.

Nor is it contended that J. Edgar Dyal was the defendants' universal agent. He had no authority, real or apparent, to sell their homes or their other property. The other principals never

themselves represented that he had authority to sell their interests in the Surrency Tract. The sole evidence of his authority to do this was his own assertion. But an agent cannot by his own act endow himself with apparent authority. His principals must in some way hold him out as their agent. Mechem, Outlines of Agency 4th Ed. § 94, p. 61.

Indeed it must have been apparent to Union Camp's representatives, had they reflected on it, that J. Edgar Dyal's interests and those of the other persons he purported to represent were in conflict. His wife would have received a rental of $12,158.19 a year at least so long as J. Edgar Dyal lived. But the deal made by her husband surrendered her right to rental. In return she received nothing outright—since she owned no fee and her entire interest was subject to a contingent remainder. The proceeds of her share of the fee, $29,034.66, plus a prorata of the amount paid to accelerate the option, $11,052.77 [3] would be impressed with a trust for the benefit of the contingent remaindermen. The right of the Dyal children to receive rental would also terminate though their share of the acceleration payment would to some extent compensate them.

The real benefits of the agreement would accrue to J. Edgar Dyal, who would receive $150,000 for the stumpage, and under the formula established by the trial court, $319,415.59 in payment for his fee interest and for acceleration of the option, a total of $469,415.-59—though he had no present right to rental and he could not receive payment for the fee in any way because the option owned by Union Camp could not be exercised during his lifetime.

"Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement of Agency 2d § 387. It is the agent's duty "to conduct himself

3. The Dyals disputed the manner of allocation of the amount paid to accelerate the option, but these are the computations made by the trial judge, and since they are supported by the record, they are accepted by us.

with the utmost loyalty and fidelity to the interests of his principal, and not to place himself or voluntarily permit himself to be placed in a position where his own interest . . . may conflict with the interests of his principal." Mechem, Outlines of Agency 4th ed. § 500.

■ Union Camp knew all of these facts. Knowing them, it may not enforce an agreement made by Dyal ostensibly for the benefits of others for whom he was acting as agent, but in reality to serve his own interests. Where the party dealing with an agent has "notice that the agent is not acting for the principal's benefit," the principal is not liable on the contract. Restatement of Agency 2d § 165, and particularly comment c thereunder. Neither J. Edgar Dyal nor the lawyers had authority, real or apparent, to execute the stipulation on behalf of any of the other defendants, and hence it is unenforceable as to these defendants.

■ But J. Edgar Dyal did mislead Union Camp. He induced Union Camp representatives to negotiate with him on the basis that he was prepared to deal with respect to title. He expressly authorized his lawyers to execute the stipulation. He ratified it by acquiescing in it after it was signed. Hence, the agreement is binding on him. See Ingalls Iron Works Co. v. Ingalls, N.D. Ala.1959, 177 F.Supp. 151, aff'd, 5 Cir. 1960, 280 F.2d 423; Fulford v. Fulford, 1969, 225 Ga. 9, 165 S.E.2d 848. Indeed a Georgia court has held that where a client gives express assent to a stipulation made by his lawyer referring issues to arbitration in a suit involving a dispute over a land line, "the attorney [is] thereby vested with express authority to enter into the stipulation." Dean v. Jackson, 1964, 219 Ga. 552, 134 S.E.2d 601.

## IV. IS THE AGREEMENT SEVERABLE?

If, however, the agreement was authorized by Dyal, but not by the other par-

ties, Dyal asserts that it cannot be enforced as to him alone. The principle applicable is set forth in Ga.Code § 20–112,

A contract may be either entire or severable. In the former, the whole contract stands or falls together. In the latter, the failure of a distinct part does not void the remainder. The character of the contract in such case is determined by the intention of the parties.

"In some cases, even an entire contract is apportionable . . . ." Ga. Code § 20–113.

■ Some evidence of the severability of the agreement is provided by the fact that Mrs. Willie Eason Dyal, Milton's widow, has in fact performed it, and conveyed her interest in the properties to Union Camp.

The trial court correctly found that the parties had implicitly arrived at a formula whereby the share of the price to be paid could be divided among the owners. No difficulty is encountered in doing so, for the agreement provided merely for three things, payment to the fee owners of $15 per acre for the share of each (the original option price), payment to J. Edgar Dyal of $150,000 for his share of the stumpage claim, and payment of $202,034.39 as a premium for acceleration of the option. The latter amount is approximately $5.14 per acre. Hence J. Edgar Dyal is due $231,636 for his share of the fee [4] $87,779.59 for acceleration of the option,[5] and $150,000 for the stumpage. Any claim he may have to benefit if the suit to terminate the lease succeeds will be conveyed to Union Camp.

## V. IS THE RESULT UNCONSCIONABLE?

The final argument offered on behalf of J. Edgar Dyal is that the agreement obliges him to sell at $15 an acre proper-

---

4. 5/60 interest in 12,883.44 acres and full fee ownership of 16,000 acres.

5. Computed on both interests. See Note 4.

■

ty worth more than ten times that amount. But this is only a vision of streets paved with gold, dependent upon Dyal succeeding in all his demands. It does not take into account what was really bought and sold—the chances of success or failure.

There is no claim that the option price was not fair when it was fixed. In 1971, Dyal had only a litigious claim to terminate the lease. If it failed, he would receive nothing from the law suit, though his heirs would eventually get the purchase price for the fee. Under the settlement agreement, he received a substantial sum for his stumpage claim and for the purchase price of a part of the fee, plus a bonus, during his lifetime. It is not necessary for us to speculate whether he made a good bargain or a bad one; it clearly was one that conscience can bear.

As to all the defendants, other than J. Edgar Dyal and Mrs. Willie Eason Dyal, the suit may continue. Determination of their rights will abide the outcome of the litigation.

The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.

Affirmed in part; reversed in part; and remanded.

Before MORGAN and CLARK, Circuit Judges and RUBIN,* District Judge.

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.